In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-3327

PAYSUN LONG,

*Petitioner-Appellant*,

*v.*

RANDY PFISTER, Warden, Stateville Correctional Center,

*Respondent-Appellee*.

Appeal from the United States District Court
for the Central District of Illinois.
No. 11-CV-1265 — **Michael M. Mihm**, *Judge*.

ARGUED SEPTEMBER 7, 2016 — DECIDED OCTOBER 20, 2017

Before WOOD, *Chief Judge*, and BAUER, EASTERBROOK, KANNE, ROVNER, WILLIAMS, SYKES, and HAMILTON, *Circuit Judges*.[*]

EASTERBROOK, *Circuit Judge*. Larriec Sherman was shot to death in June 2001. Four witnesses identified Paysun Long as

---

[*] Circuit Judge Flaum heard argument in this appeal but later recused himself and has not participated in its decision.

the gunman; their statements were recorded on video. Two of the four recanted before Long's trial. The other two—Keyonna Edwards and Brooklyn Irby—testified, while the video statements of the two recanting witnesses were introduced. Irby, too, had recanted before trial, telling Frank Walter, an investigator for the State's Attorney, that police officers had coerced her to name Long as the shooter. But Irby testified consistently with her video statement. On cross-examination she conceded recanting but told the jury that her original statement was true and her recantation false. The jury believed the testimony that Irby and Edwards gave in open court, convicting Long of murder.

A state court vacated this conviction because the prosecutor had argued, without support in the record, that the recanting witnesses feared Long and his friends. At Long's second trial the evidence proceeded as at the first. Edwards and Irby identified Long in court as the killer; the other witnesses' video statements were introduced. But this time, when asked on cross-examination about her recantation, Irby denied telling Walter that she had been coerced to identify Long. The defense called Walter, who testified that Irby had indeed told him that her identification had been coerced. The prosecutor did not contest Walter's testimony either on cross-examination or during closing argument. The jury convicted Long a second time, and he was sentenced to 51 years in prison. The state's appellate court affirmed on direct appeal and affirmed again after a judge denied Long's application for collateral relief. 409 Ill. App. 3d 1178 (2011).

A district court denied Long's application for relief under 28 U.S.C. §2254, but a panel of this court reversed. 809 F.3d 299 (7th Cir. 2015). The panel concluded that, by not sponta-

neously correcting Irby's testimony, the prosecutor violated the rule of *Napue v. Illinois*, 360 U.S. 264 (1959), and successors such as *Giglio v. United States*, 405 U.S. 150 (1972). The panel understood these cases to establish that, whenever any witness makes a statement that the prosecutor knows is untrue, the Due Process Clause of the Fourteenth Amendment requires the prosecutor to correct that statement immediately. That was not done in Long's second trial, and the panel held that Long therefore is entitled to collateral relief. To reach this conclusion the panel also had to address Long's procedural default in state court, which it did by holding that Long's appellate lawyer had rendered ineffective assistance by not making a *Napue* argument on direct appeal.

Because this case entails federal collateral review of a state conviction, we start with 28 U.S.C. §2254(d), which as amended in 1996 by the Antiterrorism and Effective Death Penalty Act (AEDPA) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]

The Appellate Court of Illinois ruled that any error was harmless in light of the other evidence inculpating Long. *Davis v. Ayala*, 135 S. Ct. 2187 (2015), holds that a harmless-error decision is one "on the merits" as §2254(d) uses that phrase. The state court concluded that Long had a good position as a matter of state law, because *People v. Lucas*, 203 Ill. 2d 410, 424 (2002), holds that a prosecutor must correct false

testimony that the defense elicits. Given the harmless-error ruling, however, that conclusion did not benefit Long. The panel of our court, by contrast, went straight to federal law under *Napue* and its successors, and after holding that the prosecutor had violated the rule of *Napue* stated that Long is entitled to a new trial. The panel did not mention the doctrine of harmless error or apply the standard of *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Our order setting this case for rehearing en banc vacated the panel's decision.

Long contends that the state courts rendered decisions "contrary to" *Napue* and similar decisions. Of course the state judges didn't disparage or contradict *Napue*; by citing *Lucas* the Appellate Court ruled in Long's favor, though as a matter of state law. The state court did not analyze *Napue* at all. (It was cited once but not elaborated on, given *Lucas*.) But we know from *Harrington v. Richter*, 562 U.S. 86, 97–100 (2011), that it does not matter whether a state court discusses federal precedent; §2254(d)(1) applies whenever the state court makes a decision on the merits, no matter what the state judiciary says. See also *Johnson v. Williams*, 568 U.S. 289 (2013). So we start with the merits—and because we conclude that the Supreme Court has not "clearly established" that the doctrine of *Lucas* is a rule of federal constitutional law, we need not address harmless error (or for that matter the procedural-default issue).

Long understands *Napue* and its successors to establish that the prosecutor must immediately correct any false testimony—and that it does not matter whether the defense already knows the truth, or whether the jury learns the truth before deliberating. It is not hard to find statements that, taken at a high level of generality, could be so understood.

The Court summarized the *Napue* principle this way in *California v. Trombetta*, 467 U.S. 479, 485 (1984): "The most rudimentary of the access-to-evidence cases impose upon the prosecution a constitutional obligation to report to the defendant and to the trial court whenever government witnesses lie under oath." This statement does not contain exceptions for testimony elicited by the defense, or testimony known by the defense to be false, or testimony corrected before the jury deliberates. But then the Supreme Court has never considered any of those possible qualifications. All *Napue* itself holds is that perjury known to the prosecution must be corrected before the jury retires. The Court did not say when or by whom. And *Giglio* identifies as the constitutional problem a prosecutor's deliberate deception of the jurors, which can't occur when the truth comes out at trial and the prosecutor does not rely on the falsehood.

In *Napue* and its successors: (a) the false testimony was elicited by the prosecutor (we discuss an exception shortly); (b) the truth was unknown to the defense; (c) the prosecutor asked the jury to rely on the false testimony; and (d) the jury never learned the truth. In this case, by contrast, the false testimony was elicited by the defense, which knew the truth, and the prosecutor, instead of relying on the false testimony, accepted Walter's testimony about Irby's recantation but argued that her in-court identification was nonetheless correct.

One passage in *Napue*, 360 U.S. at 269, could be read to imply that a prosecutor must correct testimony no matter who solicited it. The Court wrote: "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected". This language must be understood in light of the citation the Court gave: *Alcorta v. Texas*, 355 U.S.

28 (1957). In *Alcorta* the prosecutor had told the witness not to be forthcoming and deliberately elicited a misleading statement; the defense and the jury never learned the truth, something *Alcorta* stressed. Read in context, the passage in *Napue* implies that a prosecutor must furnish the truth whether a falsehood had been elicited deliberately (in bad faith) or inadvertently. This is how *Brady v. Maryland*, 373 U.S. 83, 87 (1963), understood it, remarking that when the prosecution withholds exculpatory evidence there is a constitutional problem "irrespective of the good faith or bad faith of the prosecution." It is accordingly not proper to read this passage of *Napue* as establishing that it is irrelevant who elicits the false testimony, whether the defense knows the truth, and whether the truth is presented to the jury. Those issues were not before the Court or expressly decided.

It is similarly inappropriate to understand *Giglio* as holding anything about these matters. There the false testimony was elicited by defense counsel, but the Court made nothing of that fact, whose significance the parties had not briefed; instead it ruled for the defense because the prosecutor embraced the witness's false statement and argued it to the jury as a basis of conviction, even though at least one of the prosecutors understood that the truth was exculpatory and unknown to the defense. The witness testified that no promises had been made; one prosecutor (who made them) knew otherwise, yet at trial the prosecution told the jury that the absence of a promise made the witness's testimony especially credible. The Justices concluded that *Brady* required the truth's disclosure and forbade the prosecutor from arguing that the witness had not been promised favorable treatment.

This case therefore entails four questions that have never been expressly decided by the Supreme Court:

- Do *Napue* and its successors apply when the defense rather than the prosecutor elicits the false testimony?

- Must the prosecutor correct false testimony when defense counsel already knows the truth?

- Does the Constitution forbid a conviction obtained when the prosecutor does not correct but also does not rely on the falsehood?

- Does the Constitution forbid a conviction obtained when all material evidence is presented to the jury before it deliberates?

Long believes that all four of these questions should be answered yes but does not contend that any of them has been answered in the defendant's favor by the Supreme Court. Instead he believes that, once a general principle has been established, a court of appeals can resolve subsidiary issues such as these. That's a possibility the Supreme Court has rejected as inconsistent with the statutory rule that, to support collateral relief, a principle must be "clearly established … by the Supreme Court of the United States" rather than by an intermediate federal court. The Justices insist that a principle be made concretely applicable to the problem at hand before it may be used on collateral review. A recent example in this sequence said, when summarily reversing an appellate decision:

> The Ninth Circuit pointed to no case of ours holding [that the prosecutor must specify in advance of trial the precise theory of liability on which it would rely]. Instead, the Court of Appeals cited three older cases that stand for nothing more than the general proposition that a defendant must have adequate notice of the charges against him. … This proposition is far too abstract to establish clearly the specific rule respondent needs. We have before cautioned the lower courts … against "framing our precedents at such a high level of generality." *Nevada v. Jackson*, 133 S. Ct. 1990, 1994 (2013).

*Lopez v. Smith*, 135 S. Ct. 1, 4 (2014). See also, e.g., *Woods v. Donald*, 135 S. Ct. 1372 (2015).

We appreciate that, if a general proposition inevitably entails some concrete application, then there's no need to wait for the Justices to apply the principle in the inevitable way. But it is not obvious to us that the *Napue* principle requires a new trial when the prosecutor fails to correct a falsehood, but the defense knows about that falsehood and corrects it. To the contrary, this court held in *United States v. Saadeh*, 61 F.3d 510, 523 (7th Cir. 1995), that there is no constitutional violation in that situation. See also *United States v. Adcox*, 19 F.3d 290, 296 (7th Cir. 1994). The proposition that defense counsel's knowledge of the truth is irrelevant therefore cannot be taken as clearly established by the *Napue* principle itself. Nor does the *Napue* principle establish that it is irrelevant whether the truth is presented in open court before the jury deliberates.

Another way to ask whether the application of *Napue* when the defense knows the truth is so obvious that it must be taken as already established is to examine how the Justices have handled a related subject. The *Napue-Giglio* rule is a cousin to the *Brady* doctrine, which requires the prosecution to reveal material exculpatory evidence. The Justices them-

selves treat *Napue* and *Brady* as two manifestations of a principle that prosecutors must expose material weaknesses in their positions. See, e.g., *Strickler v. Greene*, 527 U.S. 263, 298–99 (1999).

The Supreme Court has considered whether *Brady* requires the prosecution to disclose (or put before the jury) exculpatory or impeaching information known to the defense. The answer is no. See, e.g., *United States v. Agurs*, 427 U.S. 97, 103 (1976) (*Brady* applies only to information "unknown to the defense"). Our circuit has made the same point and added that there is no disclosure obligation under *Brady* if the defense easily could have found the information, even if it didn't find it in fact. See, e.g., *United States v. Morris*, 80 F.3d 1151, 1170 (7th Cir. 1996). Other circuits agree. See, e.g., *United States v. Wilson*, 901 F.2d 378, 380 (4th Cir. 1990). Given how *Brady* is understood, an intermediate appellate court could not confidently predict that *Napue* and *Giglio* will be treated differently—let alone so confident that we could declare (as §2254(d) requires) that this has *already* been clearly established by the Supreme Court.

In this case what occurred may well have helped the defense rather than the prosecutor. Irby's false testimony enabled the defense to depict her either as a perjurer (if she remembered what had happened) or as having a faulty memory (if she had forgotten); this could have helped the defense diminish the force of Irby's identification. It is awfully hard to see why events that may have helped the defense should lead to collateral relief in the absence of any clearly established legal transgression.

When presented with the four open issues we have identified, the Supreme Court may resolve some or all of them in

favor of a defendant in Long's position. But it has not done so to date, and §2254(d)(1) accordingly prohibits a grant of collateral relief. We do not attempt to determine how those questions would or should be resolved.

Long presents other contentions that the panel resolved against him. 809 F.3d at 313–16 (quotation from *Gone with the Wind*; prosecutor's anecdote; prosecutor's reference to a letter not in evidence; ineffective assistance of trial counsel). We agree with the panel's resolution of those issues and reinstate that portion of its opinion without reproducing the discussion here.

AFFIRMED

HAMILTON, *Circuit Judge*, joined by ROVNER and WILLIAMS, *Circuit Judges*, dissenting. The bar for federal habeas relief is high, requiring the petitioner to show the state courts unreasonably applied controlling Supreme Court precedent. 28 U.S.C. § 2254(d)(1). Petitioner Long has cleared that high bar. I respectfully dissent.

Nearly sixty years ago, the Supreme Court held that a State deprives a person of liberty without due process of law if it convicts him by knowingly using false testimony, and it imposed on the prosecutor the duty to see that perjured testimony is corrected. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). In this case, a key prosecution witness lied about a point critical to her credibility. She swore to the jury, repeatedly, that she had been consistent in identifying petitioner Long as the person who murdered Sherman. Those were lies, and the prosecutors knew they were lies. Yet the prosecutors did nothing to see that the lies were corrected.

The state courts actually recognized the due process violation but erred, as our panel explained, by excusing the violation as harmless. The majority affirms the results in the state court by first rejecting the state courts' actual reasoning and then hypothesizing possible distinctions that might be drawn between this case and the *Napue* line of cases.

Yet *Napue* itself considered and rejected the grounds the majority relies upon to excuse the Illinois courts' failure to follow it. It does not matter, the Supreme Court said, which side elicited the false testimony. *Id*. at 269. Nor does it matter whether the defense knew of the false testimony or whether the jury heard evidence contradicting the false testimony. See *id*. at 269–70. What this jury never heard was a prosecutor or judge saying that the witness had lied to the jury. Moreover,

the case against Long was so fragile that the *Napue* violation cannot reasonably be deemed harmless. The state courts' denial of post-conviction relief to Long was contrary to *Napue*, so federal habeas relief is necessary under 28 U.S.C. § 2254.

Part I of this dissent lays out the facts of the witness's perjury during Long's trial. Part II summarizes the Supreme Court's decision in *Napue*. Part III rejects the majority's efforts to limit *Napue* to excuse the state courts' failure to follow it.

I.  *The Perjury in Long's Trial*

We review here the conviction of Paysun Long for the murder of Sherman in Long's second trial. (The second trial was needed because of prosecutorial misconduct in closing argument in the first trial.) No physical evidence tied Long to the murder. The prosecution relied heavily on two witnesses—Keyonna Edwards and Brooklyn Irby—who testified that they had seen Long shoot Sherman. Edwards had her own credibility issues, since some details of her account were not corroborated by anyone else present, but our focus here is on Irby.[1]

Irby testified that she was walking through the Taft Homes housing development in Peoria on June 11, 2001 when she saw Long shoot Sherman. On cross-examination, defense counsel asked Irby whether she had previously told the prosecutor herself and an investigator that she had lied when she first told investigators in June 2001 that she had seen Long shoot Sherman. Supp. App. 132–36. Irby repeatedly denied that she had done so. Those sworn answers were lies, and the

---

[1] Two other prosecution witnesses testified that Long was not the shooter, but the prosecution was allowed to put into evidence earlier recorded statements by those witnesses saying that he was.

prosecutor knew it. Yet the prosecutor did nothing to correct
Irby's false denials of having changed her story, even in redi-
rect examination of Irby.

Long's attorney did what he could to attack Irby's lies and
thus her credibility. After the State had finished presenting its
case, the defense called Frank Walter, the prosecution's
investigator who had talked with Irby. Walter testified that
Irby had recanted her identification of Long. App. Dkt. 13–12
at 330–34. That's how the evidence closed: Irby said she had
never changed her story, and Walter said she had.

During closing arguments, the prosecution did not even
acknowledge Irby's lies, let alone correct them. The prosecu-
tion first tried to finesse the problem, saying that the defense
counsel would

> *argue* that Brooklyn Irby came to the State's At-
> torney's Office and said on an earlier occasion
> prior to her testifying and said I wasn't telling
> the police the truth. Well, she came in here and
> *raised her hand* and told you what happened and
> you saw her testimony. Maybe she thought if
> she told the State's Attorney's Office she wasn't
> telling the truth she wouldn't have to testify. *But
> when she came in here and was under oath, she told
> you what she saw* and that was consistent with
> what Keyonna [Edwards] told you and that was
> consistent with what she has told you and that
> was consistent with what Shawanda [Walker]
> told you and that was consistent with the phys-
> ical evidence.

Supp. App. 149–50 (emphases added). Missing from that careful dance around Irby's perjury is any acknowledgment that Irby had lied under oath to the jury. The prosecutors' handling of Irby contrasts with their sharp attacks on other witnesses, including prosecution witnesses, for being untruthful. See App. Dkt. 13–12 at 349–51. The prosecutors knew how to tell the jury that other witnesses had lied to them, but they never admitted to the jury that Irby had lied to the jury.

During the defense closing argument, the defense pointed out Irby's lies and reminded the jury that Walter, the prosecution's investigator, had testified that Irby had changed her story: she had told him and the prosecutor that she had lied in June 2001 about seeing Long shoot Sherman. Yet in her trial testimony she lied by denying that.

During the rebuttal argument, the prosecutor soft-pedaled the perjury. She said that Irby had recanted her story back in November 2001 when she was served with a subpoena, but immediately emphasized that Irby had (supposedly) told the truth when she was under oath. Supp. App. 171. The prosecutor *still* never acknowledged that Irby had lied to the jury in her trial testimony.

To sum up, then, a key prosecution witness lied about a point critical to her credibility, and the prosecution knew she was lying. Yet the prosecution took no steps to correct the perjury.

II.  *Napue v. Illinois*

Under the Antiterrorism and Effective Death Penalty Act of 1996, known as AEDPA, federal courts must accept a state court's decision on the merits of a habeas petitioner's claim

unless the state court decision was contrary to or an unreasonable application of clearly established law under Supreme Court authority, or based on an unreasonable finding of fact. 28 U.S.C. § 2254(d). Petitioner Long is not asking the federal courts to make new law on his behalf. He asks us only to enforce the Supreme Court's 1959 decision in *Napue v. Illinois*.

*Napue* was, like this case, a murder prosecution in Illinois. A police officer had been fatally shot in a robbery attempted by several men. The principal State's witness was a man named Hamer who was already serving a prison sentence for the same murder. Hamer testified that Napue had been one of the robbers. During Napue's trial, the prosecutor asked Hamer whether he had received any promises of leniency in return for his testimony. Hamer said no. But that was false, and the prosecutor did nothing to correct that lie. The jury was told, however, that a public defender had promised "to do what he could" for Hamer.

The prosecution later asked to have Hamer's sentence reduced based on the promise that Hamer had denied receiving in Napue's trial. When Napue heard of the effort to reduce Hamer's sentence, he sought relief from his own conviction. The state courts denied relief, but the Supreme Court reversed in a unanimous opinion by Chief Justice Warren. The Court began from the foundation that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." 360 U.S. at 269, citing *Mooney v. Holohan*, 294 U.S. 103 (1935), and other cases.

The next sentence in the opinion addresses the problem here: "The same result obtains when the State, *although not so-*

*liciting false evidence*, allows it to go uncorrected when it appears." *Id.* (emphasis added), citing *Alcorta v. Texas*, 355 U.S. 28 (1957), and other cases. (The Court later explained that this holding in *Napue* was a deliberate extension of the older ruling in *Mooney*. *Brady v. Maryland*, 373 U.S. 83, 87 (1963).)

*Napue* then rejected other attempts to excuse the use of the false testimony. First, it made no difference that the false testimony addressed Hamer's credibility rather than his substantive testimony. 360 U.S. at 269. "A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth." *Id.* at 269–70, quoting *People v. Savvides*, 136 N.E.2d 853, 854 (N.Y. 1956).

Then the Court rejected another theory for avoiding the perjury, that merely contradictory evidence would correct the problem: "we do not believe that the fact that the jury was apprised of other grounds for believing that the witness Hamer may have had an interest in testifying against petitioner [Napue] turned what was otherwise a tainted trial into a fair one." *Id.* at 270. The Court finally rejected the state court's conclusion that the false testimony would not have affected the verdict, *id.* at 271–72, since the conviction of Napue depended so heavily on whether the jury believed Hamer. See also *Wearry v. Cain*, 577 U.S. —, —, 136 S. Ct. 1002, 1006 (2016) (noting that *Napue* harmless error standard also applies to *Brady* claims).

III. *The Majority's Efforts to Limit Napue*

Since 1959, *Napue* has been understood to impose on prosecutors an obligation to *correct* prosecution evidence that they know is false. In this case, the prosecution failed to fulfill that

obligation. The state appellate court actually acknowledged the *Napue* violation, but refused, over a powerful dissent, to correct the error on the theory that the violation was harmless. *People v. Long*, 2011 WL 10457885, at *3, *4 (Ill. App. Jan. 21, 2011) (citing state cases that applied *Napue*).[2]

The majority does not try to excuse the *Napue* due process violation as harmless, as the state court did. Instead, the majority offers four supposed distinctions that might allow some other hypothetical state court to deny relief to Long and thus to avoid federal habeas relief in light of 28 U.S.C. § 2254(d)(1). On examination, however, it becomes clear that *Napue* rejected the most important of them. The last distinction evaporates when we ask what it means to present "the truth" in an adversarial trial and what counts as "correcting" perjury under *Napue*.

The majority first asks whether "*Napue* and its successors apply when the defense rather than the prosecutor elicits the

---

[2] The majority cites *Harrington v. Richter* and *Johnson v. Williams*, ante at 4, for the idea that AEDPA deference under § 2254(d)(1) applies "whenever the state court makes a decision on the merits, no matter what the state judiciary says." Both cases dealt with summary, unexplained orders issued by busy state courts. In such cases, considering possible explanations for a state court's unexplained denial of a federal constitutional claim helps preserve comity between federal state courts. Here, however, the Illinois court actually acknowledged the constitutional problem. It found a due process violation but concluded that the violation did not matter. In a case such as this, "where the state court's real reasons can be ascertained," we should look to the "actual arguments or theories that supported the state court's decision" and not to secondary or hypothetical rationales. *Hittson v. Chatman*, 576 U.S. —, —, 135 S. Ct. 2126, 2127–28 (2015) (Ginsburg, J. concurring in denial of certiorari) (internal quotations and ellipses omitted).

false testimony?" Ante at 8. *Napue* itself answered that question: "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." 360 U.S. at 269. Nothing in the *Napue* opinion suggests that the prosecution's constitutional duty of candor depends on which lawyer asked the question that drew the lie. See *Brady*, 373 U.S. at 87 (noting that this holding in *Napue* extended prior rule in *Mooney* that prohibited prosecutors from offering knowingly perjured testimony). The majority tries to explain away the broad phrasing of the *Napue* opinion by pointing to the citation to *Alcorta v. Texas*, 355 U.S. 28 (1957), and reads the teaching of *Napue* on this point as if it were confined to the facts of *Alcorta*. The better course is to assume that the Supreme Court noticed whether it was phrasing its teaching in *Napue* broadly or narrowly. We should not strain so hard to narrow it.

In fact, the Supreme Court has already confronted a case in which the prosecution violated *Napue* without itself offering the perjured testimony. In *Giglio v. United States*, 405 U.S. 150, 151–52 (1972), a key prosecution witness lied on cross-examination by denying he had received any promise of leniency. The prosecution did nothing to correct the lie because the trial prosecutor did not know of the promise. The Supreme Court reversed and remanded for a trial because of the perjury brought out by defendant's cross-examination.

The majority next asks, "Must the prosecutor correct false testimony when defense counsel already knows the truth?" Ante at 7. This is a red herring that simply misses the point of *Napue*. The majority bases this supposed distinction on the theory that the *Napue* rule is a "cousin to the *Brady* doctrine."

Ante at 8, citing *Brady*, 373 U.S. 83. *Brady* requires the prosecution to disclose to the defense evidence that tends to exculpate the accused, including evidence relevant to witness credibility. The doctrines are in fact linked. In *Giglio*, the Supreme Court explained that *Mooney* had held that deliberately deceiving a court and jury by presenting evidence known to be false is incompatible with "rudimentary demands of justice," and that *Napue* had extended that rule to cases where "the State, although not soliciting false evidence, allows it to go uncorrected when it appears." 405 U.S. at 153, quoting *Napue*, 360 U.S. at 269.

While the doctrines are linked, they are not identical. *Giglio* held that *Brady* applies even where the government's failure to disclose exculpatory evidence was inadvertent, *id.* at 154, and disclosure to the defense is sufficient to comply with *Brady.* E.g., *United States v. Walter*, 870 F.3d 622, 629 (7th Cir. 2017); *Holland v. City of Chicago*, 643 F.3d 248, 255 (7th Cir. 2011). That's why *Brady* does not apply to information already known to the defense. *United States v. Agurs*, 427 U.S. 97, 103 (1976); *Walter*, 870 F.3d at 629 But when the prosecution *knows* that a prosecution witness has lied to the court and jury, which everyone agrees happened in this case, *Napue* applies. It imposes a duty on the prosecution not merely to *inform* the defense but to ensure that the perjury is *corrected*. 360 U.S. at 269.

If mere disclosure of the perjury to the defense were enough, as it is under *Brady* and as the majority suggests here, the logic of the rule would allow the prosecution to disclose the perjury and just stand aside while the defense tries to rebut it. That is simply not a reasonable reading of *Napue*, which again instructs that the prosecution may not allow the perjury "to go uncorrected when it appears." 360 U.S. at 269. In fact,

the majority cites no case that actually interprets *Napue* as it suggests, allowing the prosecution merely to disclose the perjury to the defense without actually correcting the perjury.

*Napue* addresses not what the defense knows but the integrity of the evidence before the jury. *Napue* teaches that the prosecution has an obligation to ensure that false testimony is corrected. Nothing in the opinion suggests that the obligation is removed if the defense knows the truth and has the opportunity to offer contradictory evidence. What matters is the risk that the jury will use the false evidence to convict. The *Napue* Court put the obligation squarely on the prosecution to see that the false evidence is corrected, without the majority's proposed qualification.

The majority next asks: "Does the Constitution forbid a conviction obtained when the prosecutor does not correct but also does not rely on the falsehood?" Ante at 7. Again, the *Napue* opinion answers this question: "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." 360 U.S. at 269. The key phrase is "allows it to go uncorrected." That flatly contradicts the majority's suggestion that *Napue* left the prosecution room to avoid its obligation to correct false evidence by merely refraining from asking the jury specifically to rely upon the perjured testimony.

Finally, the majority asks: "Does the Constitution forbid a conviction obtained when all material evidence is presented to the jury before it deliberates?" Ante at 7. That proposed distinction might have a superficial plausibility, but it is also plainly contrary to *Napue*. It also ignores the reality of a jury trial in our adversarial system. Under the majority's theory, *Napue* might allow prosecutors to respond to known perjury

by merely allowing the defense to contradict the perjury. It does not. *Napue* made clear that the prosecution has a duty to correct the perjury.

A jury that hears evidence merely contradicting the perjury cannot be said to *know* the truth. Nor can mere contradiction reasonably be deemed to be a "correction." The prosecution here never admitted to the jury that Irby lied to them. The jurors heard Irby repeatedly claim under oath that she had told a consistent story, and they heard investigator Walter testify that she had not been consistent. The judge instructed the jurors that it was up to them to evaluate the credibility of the witnesses and that the lawyers' arguments were just argument, not evidence.

In the post-conviction proceedings, and with the benefit of hindsight, the lawyers and judges know that Irby lied to the jury. That fact is "as clear and certain as a piece of crystal or a small diamond." See *Nix v. Whiteside*, 475 U.S. 157, 190 (1986) (Stevens, J., concurring). But the jurors just heard conflicting testimony from Irby and Walter. The prosecution even told them in closing argument that a witness's prior inconsistent statements should not affect her credibility! To the jury, whether Irby had lied to them was not a certain fact but only a possibility. It was one of those "mixtures of sand and clay" more familiar to trial lawyers and judges. See *id*. As Justice McDade explained in her dissent in the Illinois Appellate Court, due process and *Napue* are violated if the prosecutor can leave "jurors to somehow discern what he had the *legal obligation* to tell them—that Irby had lied under oath." *Long*, 2011 WL 10457885, at *8 (McDade, J., dissenting) (emphasis in original). The Supreme Court made the same point more recently. The Court explained that due process of law usually

relies on the presentation of contradictory evidence, but noted the exception for perjury by prosecution witnesses, where due process calls for much stronger medicine. *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012).

In short, the majority's suggestions that *Napue* leaves the state courts room to avoid following it on the facts of this case are without support. *Napue* expressly rejected several of the suggestions, and its logic clearly rejects the last.

IV. *Remaining Issues*

The panel explained why Long's due process claim under *Napue* was not procedurally defaulted. 809 F.3d at 308–09. And the *Napue* due process violation cannot reasonably be dismissed as harmless or non-prejudicial under any available standard, whether under *Napue* itself, 360 U.S. 272 (false testimony "may have had an effect on the outcome of the trial"), *Brecht v. Abrahamson*, 507 U.S. 619, 622 (1993) (whether error "had substantial and injurious effect or influence"), or *Chapman v. California*, 386 U.S. 18, 24 (1967) ("harmless beyond a reasonable doubt").

The Illinois Appellate Court acknowledged in three different appeals, and this court's panel explained, that the case against Long was weak. See *Long*, 2011 WL 10457885, at *3 ("not overwhelming"); Supp. App. 63 (affirming second verdict: evidence in second trial was "closely balanced"); Supp. App. 49 (reversing original verdict: evidence in first trial was "closely balanced"); *Long*, 809 F.3d at 311 (noting that case against Long was "weak"). No physical evidence tied Long to the murder. All four of the State's eyewitnesses posed problems. Two testified that they did *not* see Long shoot Sherman. Edwards had her own credibility problems. And Irby lied to

the jury. The State's failure to correct Irby's perjury likely influenced the jury. It was not reasonable of the state court to find that merely offering contradictory evidence (from investigator Walter) was sufficient to cure the *Napue* due process violation. See *Long*, 809 F.3d at 311.

In evaluating and rejecting the possibility of harmless error, we consider the trial record as a whole. *Napue*, 360 U.S. at 272; see also *Giglio*, 405 U.S. at 154 (reversing where perjured testimony was key to prosecution's case); *Long*, 809 F.3d at 311. We should not close our eyes to other instances of prosecutorial overreach, including two outrages from the rebuttal closing argument, when the defense could not respond.

First, the prosecution pulled a blatantly racist stunt, comparing those present when the police arrived to the slave characters in *Gone with the Wind*, quoting from the scene where Scarlett O'Hara tells the slave Prissy to help her deliver Melanie Wilkes's baby. Prissy famously tells "Miss Scarlett" that she "don't know nothin' 'bout birthin' babies," and is promptly slapped. See Supp. App. 168; see also Supp. App. 70–71 (McDade, J., dissenting from affirmance on direct appeal) (prosecutor's use of *Gone with the Wind* passage was "blatant appeal to racism" that worked). And a few moments later, the prosecutor went so far as to describe a letter Irby had written that was not even in evidence. The judge had to interrupt and told the jury to disregard that blatant attempt by the experienced lead prosecutor to put unadmitted hearsay in front of the jury, Supp. App. 171, but she got the jury's attention. During deliberations, the jury asked to see that letter.

In short, Long was not convicted in a fair trial. We should order that he receive a new trial.