In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 16-1209 & 16-1325

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ANTONIO WALTER and KENNETH BELL,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 CR 516 — **Elaine E. Bucklo**, *Judge.*

ARGUED MAY 25, 2017 — DECIDED AUGUST 29, 2017

Before WOOD, *Chief Judge*, and BAUER and HAMILTON, *Circuit Judges*.

WOOD, *Chief Judge*. The Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83 (1963), might seem a bit strange to someone who thought that the adversary system in criminal cases allows each side to adopt a "no holds barred" litigation stance. But that is not the way the Constitution structures criminal procedure. From the Fifth Amendment's privilege against compulsory self-incrimination, to its double-jeopardy

clause, to the rights conferred by the Sixth Amendment both to be informed of the nature and cause of the accusation and to be confronted with witnesses, to the due process right to be convicted only upon proof beyond a reasonable doubt, the system is replete with safeguards for an accused.

The obligation of the prosecution to turn over any favorable evidence to the defendant, first announced in *Brady*, is one aspect of the due process right. Appellants Antonio Walter and Kenneth Bell assert in this appeal that the prosecution failed to live up to its *Brady* obligations. They also argue that the district court abused its discretion under Federal Rule of Evidence 404(b) by admitting, over objection, evidence of Bell's prior drug sales. Even granting that there may have been a Rule 404(b) error, it is a close question whether it was harmless, especially for Walter. In the end, however, this does not matter, because we conclude that the *Brady* error requires a new trial for both defendants.

## I

In November 2010, federal and state authorities arrested over 100 people as part of a two-year investigation known as "Operation Blue Knight." Bell was one of those arrested, and on November 15, 2010, he was charged in federal court with one count of heroin distribution. See 21 U.S.C. § 841(a)(1). As that case progressed, a different investigation led in July 2012 to indictments of Bell and Walter for conspiring from 2007 through November 2010 to sell over 1,000 grams of heroin in violation of 21 U.S.C. § 846. Bell wound up pleading guilty to the 2010 charge after his motion to consolidate the two cases was denied. After a six-day trial on the 2012 charges, a jury

convicted both Walter and Bell on October 24, 2013. The district court sentenced Walter to 335 months and Bell to 276 months in January 2016.

The government's theory was that Walter and Bell were members of the same drug trafficking organization, which ran "drug spots" (that is, street corners where heroin was sold) on Chicago's West Side. Bell supplied heroin for three drug spots located at Kedzie Avenue & Ohio Street, Chicago Avenue & Christiana Street, and St. Louis Avenue & Ohio Street. Walter was a supervisor who oversaw drug spots. The business model was straightforward: organization members mixed Bell's heroin with Dormin (a sleeping pill) and divided it into user quantities ("blows"), a process called "going to the table." Runners then took packs of blows to the drug spots, where other members sold them to users.

The government's case was not ironclad. It rested on evidence that Bell was inexplicably wealthy (*e.g.*, flush with cash and cars, able to take extravagant trips), physical samples of heroin seized from organization members, and expert testimony about drug trafficking. Conspicuously absent was any direct evidence tying either Walter or Bell to the alleged conspiracy. Because there were no controlled buys or recorded incriminating statements, the government's case hinged on witness testimony. Seven witnesses identified Walter as a participant in the drug organization; five of them fingered Bell as the drug supplier. The problem was that these witnesses, unsurprisingly for this type of case, were hardly model citizens. Their knowledge of the defendants' involvement in the organization stemmed from their own participation. All seven had been charged with or convicted of drug crimes, and six of them were testifying pursuant to agreements that held out the

possibility of reduced sentences. As the defense was at pains to point out, personal involvement, lengthy criminal histories, and a desire to secure lenient treatment all raised major credibility concerns.

Two aspects of the trial concern us. First, Bell's lawyer called to the stand two officers involved with Operation Blue Knight and elicited detailed testimony about its thoroughness. Information came out that three of the government's witnesses had been arrested during the course of that investigation. Counsel took care, however, to avoid revealing that Operation Blue Knight had uncovered two instances in which Bell was selling heroin in controlled buys, and that he eventually had been arrested for doing so. These omissions might have given the jury the inaccurate impression that two investigations in a row had failed to yield any concrete evidence of Bell's wrongdoing. Such an inference would have reinforced the defense's central argument—that the government's witnesses were lying to save themselves. The prosecution sought to rebut that theory on cross-examination by eliciting testimony from FBI Task Force Officer Michael Lipsey that Operation Blue Knight had produced a recording of Bell selling heroin to a confidential informant. The defense's objection to that line of questioning was overruled, though the district court did issue a limiting instruction cautioning the jury to consider the evidence "only as a rebuttal to evidence presented by defendant Bell about the investigation conducted by law enforcement in this case."

The second issue relates to the government's failure to disclose a damaging remark by one of its witnesses, Dushae Nesbitt, about a key government witness, Edmund Forrest. Forrest was a career criminal and relatively

senior organization member who had known Walter "all [his] life," and Bell for "a lot of years." He testified on the first day of trial pursuant to a plea agreement under which the government agreed to recommend 15 years off his 30-years-to-life guideline range, and which allowed for a free fall to a floor of 10 years. Even so, Forrest's initial testimony offered only lukewarm support for the government's case. He stated that he had seen Walter in the room while heroin was being prepared for sale, but he did not remember Walter's actively participating. He maintained that Bell was rarely present, and he did not recall how often Bell supplied heroin. Forrest's memory improved after he spoke with the prosecution during a lunch break. In the afternoon he testified that Bell dropped off heroin to Walter around three times a month, and that cash from the day's sales was usually handed over to Walter.

Nesbitt testified on the second-to-last day of trial. He did so involuntarily—he was the only witness who did not have an agreement with the government—and invoked his Fifth Amendment rights until the government obtained an immunity order. Nesbitt was less taciturn outside of the courtroom. The critical event for the defendants' *Brady* claims came when, on October 22, 2013, while the trial was still ongoing, Nesbitt was out in the hallway talking to FBI Agent Helen Dunn. He told Dunn that Forrest, while out on bond and cooperating with the government, was still "at the table" and was still selling narcotics for a supplier known as "KMART." This directly contradicted Forrest's earlier testimony that he had given up drug sales while on bond. Dunn informed the prosecution of the exchange either that evening or the following day (the last day of trial). The government said nothing to the defense about Nesbitt's revelations.

Indeed, the defense heard nothing about Nesbitt's conversation with Dunn until almost two months later, long after the jury had returned its verdict. On December 18, 2013, the government sent defense counsel a letter in which it had this to say about the hallway encounter:

> On or about October 22, 2013, FBI Agent Helen Dunn had a conversation with DuShae Nesbitt outside of Judge Bucklo's courtroom in the Dirksen Building. Nesbitt told Agent Dunn that Edmund Forrest is still selling drugs and is "at the table" on a regular basis. According to Nesbitt, Forrest is selling drugs for FNU LNU a/k/a "KMART," who is a cousin of Steven Collins a/k/a "Cupcake." Nesbitt said that Forrest is using Collins' apartment near Chicago Avenue and Spaulding Street in Chicago.

The December 18 letter noted that a follow-up interview had not yielded any more information.

The government sent a second letter to the defense on February 10, 2014. That letter relayed the results of an interview of Nesbitt after he pleaded guilty to some state drug charges:

> Nesbitt said that Forrest was "at the table" mixing heroin for street distribution from at least June 2013 until September 2013. Nesbitt knows this because Nesbitt saw Forrest "at the table" two or three times during that time period. They were mixing heroin for the Chicago/Christiana drug spot, which was selling about $3,000–$4,000 of heroin per day.

The apartment they used to mix the heroin was on Cicero near Madison. Nesbitt was running bundles and "working packs" at Chicago/Christiana, which led to the two state cases that Nesbitt recently pled guilty to. Nesbitt said he also gave Forrest money from heroin sales on occasion during that period and saw others give Forrest money from heroin sales. Nesbitt said that FNU LNU aka "KMART" was running the Chicago/Christiana drug spot.

Based on conversations with Forrest, Nesbitt believes that Forrest may have been "at the table" for Chicago/Christiana prior to June 2013 as well.

\*\*\*

As you know, Forrest was on bond for his federal case during 2013. He is currently in custody.

A final letter dated July 8, 2014, confirmed that Dunn's hallway conversation with Nesbitt had occurred before the conclusion of the trial.

The jury returned its verdict of conviction on October 24, 2013. Sentencing, however, was delayed repeatedly: ultimately Bell was sentenced on January 20, 2016, and final judgment in his case was entered on February 4, 2016; and Walter was sentenced on January 21, 2016, with final judgment entered on February 2, 2016. After the jury's verdict but long before final judgment, on July 19, 2014, Bell and Walter moved for a new trial. That motion argued that

their *Brady* rights were violated by the government's failure promptly to pass along what Dunn learned from Nesbitt during the October 22, 2013, hallway conversation. Two months later, well before the district court ruled on the motion, this court decided *United States v. Gomez*, 763 F.3d 845 (7th Cir. 2014) (*en banc*). The new framework adopted in *Gomez* convinced Bell and Walter that the district court's decision to admit the evidence of Bell's prior drug sales also required reversal. They amended their motion for new trial to add that argument.

Rule 33 of the Federal Rules of Criminal Procedure normally requires motions for new trial to be filed within 14 days of the jury's verdict, unless the motion is based on newly discovered evidence, in which case it may be filed within three years of verdict. Walter and Bell did not know of the Nesbitt statements until well after the 14-day mark, and the government does not appear to have stood on any objection to the timeliness of their motion. These deadlines are not, in any event, jurisdictional. See *Eberhart v. United* States, 546 U.S. 12, 19 (2005). With respect to the Rule 404(b) point, the government tried to have it both ways: it filed a response with the following comment: "This motion is not based on newly discovered evidence. As a result, it is untimely and should be denied. That said, the government respectfully requests that the Court address the merits of the motion as well and deny it on that basis as well." In light of the government's final statement, the district court chose to decide the Rule 404(b) argument on its merits, as it was entitled to do. We thus place no weight on the timing of either aspect of the new-trial motion.

In separate orders issued the same day, December 22, 2014, the district court denied both aspects of the amended motion

for new trial. With respect to the Rule 404(b) argument, the court reasoned that Bell had opened the door to the testimony about his earlier drug sales by mischaracterizing Operation Blue Knight. The court rejected the *Brady* argument on the ground that neither defendant could demonstrate any prejudice from the government's failure to disclose Nesbitt's statements to Dunn, even granting that they were favorable to the defense as impeachment evidence and they were not disclosed in time for use at the trial. Forrest's statement, the court thought, was corroborated by other sources, which lessened its importance. Similarly, Nesbitt's remark would have done little further damage to Forrest's credibility, because Forrest's credibility was already in tatters—defense counsel had excoriated him on cross-examination, highlighting his extensive criminal history, his supposed motive to lie to preserve his deal, and the inconsistencies within his trial testimony. Both defendants have now appealed.

## II

We begin with the claim, raised by Bell and joined by Walter (even though there was no comparable evidence against him), that the district court erred by allowing Officer Lipsey to testify about Bell's sale of drugs to an informant. "We review the district court's decision to admit evidence under [Federal] Rule [of Evidence] 404(b) for abuse of discretion only." *United States v. Curtis*, 781 F.3d 904, 907 (7th Cir. 2015). Even if the court's decision to admit the evidence was mistaken, however, "evidentiary errors are subject to harmless error review." *United States v. Dvorkin*, 799 F.3d 867, 884 (7th Cir. 2015) (alteration and citation omitted). "To determine whether an evidentiary error is harmless, we consider whether, to the average juror, the prosecution's case would

have been significantly less persuasive absent the error." *Id.* (citation omitted).

Rule 404(b) bars otherwise relevant evidence "of other crimes, wrongs, or acts if the purpose is to show a person's propensity to behave in a certain way." *Gomez*, 763 F.3d at 855. But it allows the use of other-act evidence for "another purpose," a category that includes (but is not limited to) "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b). Though Rule 404(b)'s framework is superficially straightforward, "confusion arises because admissibility is keyed to the *purpose* for which the evidence is offered, and other-act evidence is usually capable of being used for multiple purposes, one of which is propensity." *Gomez*, 763 F.3d at 855.

*Gomez* is our most recent word on how to distinguish between propensity and non-propensity purposes. There we stressed that Rule 404(b) "allows the use of other-act evidence only when its admission is supported by some propensity-free chain of reasoning." *Id.* at 856. The question is not "*whether* the proposed other-act evidence is relevant to a non-propensity purpose but *how* exactly the evidence is relevant to that purpose—or more specifically, how the evidence is relevant without relying on a propensity inference." *Id.* Bell's theory is that Officer Lipsey's testimony does not pass that test because his past heroin sale is relevant only to show a propensity for drug dealing.

Bell has a point. The government argues that it wanted to use the evidence of the prior sales to rebut the inference Bell was trying to raise that he had a clean record, by misleadingly implying that not only did he elude the 2012 investigation, but

also that he was never caught red-handed by Operation Blue Knight. This, it says, is a non-propensity purpose that justifies admitting the challenged testimony. As it sees things, the testimony of the prior sales would correct Bell's mischaracterization of Operation Blue Knight. We do not dispute the notion that correcting a misleading suggestion or implication can be a valid non-propensity reason for admitting other-act evidence—Rule 404(b)'s list is illustrative, not exhaustive. See *e.g.*, *Curtis*, 781 F.3d at 909–11. But we are skeptical that this is the use to which the government intended to put the Operation Blue Knight evidence. The only reason to correct the record was to show that Bell, contrary to his insinuation, had in fact been caught selling heroin. And the only reason *that* conclusion mattered was to invite the jury to infer that he was likely doing so again in the charged conspiracy.

The district court tried to address this problem with its limiting instruction following Officer Lipsey's testimony. The instruction was broadly in line with *Gomez*, see 763 F.3d at 860–61, but it was incomplete. It left out the critical point that the Operation Blue Knight purchases could not be considered for propensity purposes. The government argues that, even if it was flawed, the instruction resolved any problem because its contents resembled the instruction the defense requested, and Bell's lawyer said "if we give [the jury] this instruction, the matter is cured." But Bell's lawyer was talking about his own proposed instruction, which (unlike the one the court gave) spoke to the propensity issue by forbidding the jury to consider the controlled buy "as evidence of either defendant's guilt in this case."

A finding that the rule was violated would normally require us to take the next step and decide whether the error

was harmless. See FED. R. CRIM. P. 52(a). We regard that as a close question. It is one that we do not need to resolve, however, because we conclude that the prosecution's non-disclosure violated *Brady*. We trust that in any further proceedings, the prosecution will take care not to fall into the same Rule 404(b) trap again.

### III

To succeed on a *Brady* claim, a defendant "bears the burden of proving that the evidence is (1) favorable, (2) suppressed, and (3) material to the defense." *United States v. Walker*, 746 F.3d 300, 306 (7th Cir. 2014) (internal quotation marks and citation omitted). Both sides agree that Nesbitt's hallway disclosures were favorable to the defense, and so we are left with the question whether the government suppressed anything and if the suppressed evidence was material. There is no doubt that the prosecution did not turn over the evidence in time for use at the trial, but its failure to disclose would not have violated *Brady* if the defense already had the evidence. See *United States v. Morales*, 746 F.3d 310, 316 (7th Cir. 2014). Evidence is material under *Brady* "if there is a reasonable probability that, had [it] been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433–34 (1995) (quotation marks omitted). We review the district court's denial of a motion for a new trial based on an alleged *Brady* violation for an abuse of discretion. *Walker*, 746 F.3d at 306.

The government contends that the record reflects that Walter and Bell did already know the key fact that Nesbitt revealed: that Forrest had lied when he said that he was no longer dealing drugs while he was cooperating with the government. But the evidence to which it points is fatally vague.

In arguing for a continuance, Bell's lawyer said only, "I believe there may be evidence indicating that there is collusion between" Nesbitt and Forrest. While cross-examining Nesbitt, Walter's lawyer asked if the heroin he had recently been arrested for selling "[w]as … [Forrest]'s heroin?" The lawyer then added "[b]ut Edmund Forrest is still out on Chicago and Christiana, isn't he?" to which Nesbitt replied, "Yes."

It is pushing too hard to say that a reference to "collusion," which is all we have in the first example, is enough to show that Forrest was out on the street dealing drugs even as he was cooperating with the government and telling it that he was doing no such thing. The other two examples to which the government points—asking if the heroin was Forrest's and if Forrest was "out on the street"—would be opaque at best to the jury. Asking Forrest if he still frequented an area where heroin was sold is not the same as asking if Forrest was still involved with selling the drug. Forrest could be "out on Chicago and Christiana" as a customer, or simply because he lived in the vicinity. Nesbitt's account to Dunn, set out above, was in an entirely different league. He unambiguously reported that Forrest was still actively in the drug trade. On top of that, the statements to which the government points are equivocal, qualified by such language as "I *believe*" and "there *may* be evidence" (emphasis added). Nesbitt's statements to Dunn, in contrast, were unqualified.

The fact that Forrest is an admitted lifelong drug dealer with at least two controlled-substance convictions (to say nothing of his firearm convictions) does not undermine the incremental value of this impeachment evidence. (As we said earlier, most of the witnesses in this trial had similar flaws.) It answered the important question whether Forrest sold heroin

*while* he was a cooperating witness. Nothing else in the record directly spoke to that crucial point.

And that was not all that Nesbitt's hallway remarks added. The government largely ignores the fact that Nesbitt's comment (if believed) revealed that Forrest was selling on behalf of a *new* supplier named "KMART." If the jury thought that KMART had taken over this area, and if it further believed that there was room for only one supplier, it might have found that Bell was not that person. Nesbitt and Forrest had been selling on those corners before Bell's arrival, and they continued to sell after Bell's arrest. That is far from conclusive evidence pointing to Bell's non-involvement, but it could have been one piece of a puzzle.

That leaves materiality. The government attacks the materiality of Nesbitt's statements on two grounds: first, that the remaining evidence supporting its case was so strong that the additional information he was providing about Forrest could not have made any difference; and second, that the use of Nesbitt's information to impeach Forrest's credibility would have made no difference, because his credibility was already so damaged. We do not need to find, however, that "but for" the failure to disclose Nesbitt's impeachment evidence, the defendants would not have been convicted. The standard is only whether there is a reasonable probability of a different outcome. We conclude that the evidence meets this standard.

The prosecution presented no direct evidence of either defendant's involvement in the charged conspiracy—the case came down to the credibility of the government's witnesses, and they were questionable at best. Apart from the fact that the witnesses were involved in the same drug trafficking organization as Walter and Bell, they were hardly a trustworthy

bunch. Jeffrey Scott, for example, was testifying to secure a reduced sentence in connection with his own involvement in the conspiracy. He had five felony drug convictions; he had violated the terms of his bond by (among other things) using marijuana; and he was known as "Scotty Toohigh." Other witnesses had comparable backgrounds and motivations. Against that backdrop, Forrest's testimony was important because of its detailed, firsthand nature, and because it corroborated what the other witnesses were saying.

Had the defense been able to impeach Forrest with Nesbitt's information, Forrest's reaction could have done wonders for the defense. Nesbitt's statements, if believed, showed that Forrest was actively disregarding his cooperation agreement, his bond, and the law. Had this been raised with him on cross-examination, Forrest might have invoked the Fifth Amendment and refused to testify in order to avoid either perjuring himself or opening himself up to yet another drug conviction. At the least, Nesbitt's statement would have dented Forrest's assertion that he had been on the straight and narrow since he began cooperating with the government. That matters. Such a claim would enhance the witness's credibility with the jury, if one thinks that jurors are more likely to trust a reformed criminal than an active one. Yet the implication is flipped if the redemption story turns out to be a lie. *United States v. Boyd*, 55 F.3d 239, 246 (7th Cir. 1995). If the jury in this case had learned of Forrest's ongoing criminal conduct, "it might have doubted [his] testimony that [he] had 'seen the light.' Knowing that [he was] lying under oath about [his] using and dealing in drugs, the jury might reasonably have supposed that [he was] lying about the criminal activities of the defendants as well." *Id.*

The defense could even have benefited if Forrest had vigorously denied Nesbitt's accusation. If the jury disbelieved Forrest, his credibility would have been shot. If they believed him, Nesbitt's credibility would have been badly damaged. And Nesbitt, it bears repeating, was the only organization witness who was not testifying pursuant to an agreement with the government. Even if the jury could not decide whom to believe, the result would have been a more skeptical reception for both Forrest and Nesbitt.

This is not to say that the government could not have convicted the defendants if the defense had been told of Nesbitt's statement; that outcome was certainly possible. But the standard, once again, is only a "reasonable probability" that disclosure would have changed the result of the proceeding. *Kyles*, 514 U.S. at 433–34; *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017). That bar has been met. We have no need to consider whether Walter and Bell's alternative theory—that they could have used Nesbitt's reference to "KMART" to suggest that Bell was not the supplier during the relevant period—is plausible enough to support relief.

## IV

Because Walter and Bell's rights under *Brady* were violated by the government's failure to disclose material impeachment evidence to them in time for use at the trial, we VACATE both convictions and REMAND for a new trial.