In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 16-2540

THOMAS R. SOCHA,

*Petitioner-Appellant,*

*v.*

REED A. RICHARDSON,

*Respondent-Appellee.*

_____

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 08-C-994 — **Rudolph T. Randa**, *Judge.*

_____

ARGUED SEPTEMBER 6, 2017 — DECIDED NOVEMBER 3, 2017

_____

Before WOOD, *Chief Judge*, and ROVNER and SYKES, *Circuit Judges*.

WOOD, *Chief Judge*. Thomas Socha has won two battles in his effort to obtain relief from his Wisconsin conviction for murder. See *Socha v. Pollard*, 621 F.3d 667 (7th Cir. 2010) (*Socha I*); *Socha v. Boughton*, 763 F.3d 674 (7th Cir. 2014) (*Socha II*). He is now hoping to win the war. Perhaps he would have been able to do so, if federal courts had plenary authority to review state-court criminal proceedings. But they do not. Especially

since the enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA) in 1996, state prisoners seeking federal habeas corpus relief have been required to overcome a set of rules that, in the aggregate, require every benefit of the doubt to be given to the state courts. Socha would like us to find that the state prosecutor in his case violated the obligation recognized in *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose potentially exculpatory evidence to him. But even though the prosecutor indeed withheld potentially impeaching evidence from Socha, the state courts concluded that there was no reasonable probability that this evidence would have changed the verdict. Because this conclusion was not so outlandish as to be unreasonable, we must affirm the decision of the district court refusing to issue the writ. See 28 U.S.C. § 2254(d).

# I

In November 2001, Socha and his acquaintances, Lance Leonard and Victor Holm, each forged a stolen check. On November 17, police officers began asking questions. They went to Holm's apartment, seeking Leonard, but Leonard was not there. Holm agreed to go with them to the stationhouse, where he admitted his forgery and said that Leonard had also forged a check. Socha's name did not come up.

Accounts of what happened over the next few days differ. But it is clear that Leonard moved from place to place, avoiding contact with the police. On November 20, 2001, Holm and his friend, Dennis Drews, drove Leonard from Berlin, Wisconsin, 140 miles or so upstate to Crandon. They arrived at the house of Holm's brother, Vincent. Leaving Leonard behind and armed with a shotgun, Holm, Drews, and Vincent left the house and dug a grave. Back again at Vincent's house, Holm and Drews persuaded Leonard to go on an errand with them.

The errand turned out to be a fateful one for Leonard. They drove him to the grave they had just dug, murdered him, and buried the body. Meanwhile, Socha was back in Berlin partying with Holm's girlfriend, Beth Mrazik, and making sure that the two were seen in several bars. That night and early morning, Holm and Mrazik (and possibly Socha) exchanged multiple phone calls.

In the days after November 20, news of the murder quickly spread. Drews bragged about it to Mrazik, who told a friend, who in turn informed the police. By December 6, Holm and Drews were arrested. No one had yet implicated Socha. That did not happen until a few months later when Mrazik, Drews, and Holm alleged that Socha was involved in the plan to kill Leonard. Eventually Mrazik, Drews, and Holm entered into plea agreements with the state.

In August 2002, Socha was tried for being a party to the crime of first-degree intentional homicide. See Wis. Stat. §§ 940.01, 939.05. The prosecution's theory of the case identified Socha as the mastermind, who wanted Leonard dead primarily to ensure that he did not reveal Socha's drug-dealing and only secondarily to keep him from telling the police about the check-forgery scheme. The state presented testimony from Holm and Drews that, with Socha, they decided that Leonard had to die. Others testified to seeing the three men in conversations in the days before the murder. There was also testimony that Socha behaved suspiciously once the police began investigating the murder. After a two-day bench trial, the judge found Socha guilty.

Meanwhile, on April 11, 2002, the police had interviewed Roy Swanson, Holm's cellmate. While the recording and transcript of the interview were turned over to Holm's counsel, a

slip-up in the prosecution's office resulted in a failure to turn them over to Socha. Consequently, Socha was not aware of the Swanson interview until after his trial. In the interview, Swanson discussed his impressions of Holm. He commented that "[a] lot of times [Holm is] still lying." He recounted statements exhibiting Holm's lack of remorse about Leonard's death, saying at one point that he "should get a medal for killing [Leonard]." This was in marked contrast to the performance Holm gave at trial, where he was wiping away tears in supposed contrition. Swanson said that Holm had admitted that he and Lance "were the ones who stole the checks in the first place," and even that Holm confessed that he had "killed before in Arizona." Swanson got the impression that Holm's accusation of Socha was concocted: Holm, he said, "talked to his lawyer [who] said, well if you were coerced in any way, or forced to say something, you know what I'm saying, do something against your will, you know, that's a … Oh, and then all of a sudden a big light bulb pops up on his head and says, 'Oh, Mexican Mafia and Tom Socha … .'" Nonetheless, Swanson's story was not entirely helpful for Socha. At one point Swanson went so far as to say that "Tom's a major player in the murder."

Socha knew about the Swanson interview by the time he filed his direct appeal and post-conviction motions. Among other things, he argued that he was entitled to a new trial under *Brady* because the prosecutor failed to disclose the Swanson transcript and recording. The circuit court, presided over by the judge who had handled the trial, denied his post-conviction motions. On December 5, 2006, the Wisconsin Court of Appeals affirmed the denial of all relief. It dispatched Socha's *Brady* claim in one paragraph, which characterized the Swan-

son evidence as "inconsequential" and not "very exculpatory." The Wisconsin Supreme Court denied Socha's petition for review.

Socha then turned to the federal court for habeas corpus relief under 28 U.S.C. § 2254. The district court dismissed his petition twice on timeliness grounds, and we reversed twice. See *Socha I*, 621 F.3d at 673; *Socha II*, 763 F.3d at 688. At last reaching the merits, the district court found no grounds supporting issuance of the writ. We granted a certificate of appealability limited to the alleged *Brady* violation. See 28 U.S.C. § 2253(c).

## II

Socha is entitled to habeas corpus relief under *Brady* only if he can show three things: first, that the evidence at issue was favorable; second, that the evidence was suppressed; and third, that it was material to his defense. *United States v. Walker*, 746 F.3d 300, 306 (7th Cir. 2014). And it is not really enough just to establish those points; instead, he must show that the decision of the state courts with respect to the *Brady* claim fails to meet the standards set out in AEDPA, 28 U.S.C. § 2254(d). AEDPA permits us to issue a writ of habeas corpus only if the last state court's decision on the merits (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* We do not lightly assume that the state court erred. *Rhodes v. Dittmann*, 783 F.3d 669, 674 (7th Cir. 2015). "[I]f we can posit arguments or theories that could have supported the state court's decision, and if fairminded jurists could disagree about whether

those arguments or theories are inconsistent with Supreme Court holdings," we must deny the petition. *Kidd v. Lemke*, 734 F.3d 696, 703 (7th Cir. 2013).

Socha contends that we should review the decision of the Wisconsin Court of Appeals, the last state court to consider his *Brady* claim, *de novo* because it was not "on the merits." But this fails to give the state appellate court its due. Its *Brady* analysis addresses the prosecutor's failure to turn over "notes of a sheriff's deputy" who interviewed Swanson. Socha thinks that the "notes" to which it refers are not the same as the Swanson interview, but instead are notes that an officer took during Socha's trial. That dispute is immaterial, because the state appellate court's opinion also refers to "Swanson's interview" and contains a quote from the interview transcript. We grant that the court's *Brady* discussion was brief, but AEDPA does not require full-blown analysis. The state court did enough to earn the deference commanded by AEDPA. See *Harrington v. Richter*, 562 U.S. 86, 98–100 (2011).

A

With the proper perspective in mind, we turn to the merits. The first question is whether the Swanson interview was the type of favorable material that engages the prosecutor's duty to turn over evidence. The Wisconsin Court of Appeals disputed Socha's assertion that the Swanson interview was "very exculpatory." The court was right, if "exculpatory" means only something that suggests innocence. But the *Brady* duty reaches impeachment evidence as well. *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Holland v. City of Chicago*, 643 F.3d 248, 255 (7th Cir. 2011). Indeed, a prosecutor must share impeachment evidence with the defense even if the evidence partly inculpates the defendant. As the Supreme Court put it

in *Strickler v. Greene*, 527 U.S. 263, 282 n.21 (1999), "*Brady*'s disclosure requirements extend to materials that, whatever their other characteristics, may be used to impeach a witness" (citing *Bagley*, 473 U.S. at 676); see also *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004) (holding impeachment evidence was subject to *Brady* though it had "an inculpatory and an exculpatory effect").

Socha's attorney could have used the Swanson interview for impeachment. It contained statements that directly contradicted Holm's testimony (for example, Holm's comment that he should get a medal for killing Leonard rebuts the remorse he described and showed on the witness stand). If Socha had had access to the interview before the trial, he could have used it to cross-examine Holm. See Wis. Stat. § 906.13. This is so even though, for some lines of questioning, Socha would have been stuck with Holm's answers, since the transcript would have been inadmissible as extrinsic evidence on collateral matters. See Wis. Stat. § 906.08(2). Whether Socha's counsel for strategic reasons may have elected not to use the interview because of the inculpatory statements is a matter of speculation. The point of *Brady* is to leave that decision with defense counsel, not to allow the prosecutor to withhold impeachment or direct evidence because she guesses that the defense would pass on the chance to use it. The Swanson interview was impeachment evidence falling within *Brady*'s ambit, and it was unreasonable for the Wisconsin Court of Appeals to conclude otherwise. See *Bagley*, 473 U.S. at 676–77.

B

That is not enough to win the day for Socha, however. The next issue is whether the prosecution "suppressed" the Swan-

son interview. Evidence is considered impermissibly with-held if "(1) the prosecution failed to disclose the evidence before it was too late for the defendant to make use of the evidence, and … (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *Harris v. Kuba*, 486 F.3d 1010, 1015 (7th Cir. 2007) (citation omitted).

The Wisconsin Court of Appeals recognized that the prosecution did not provide the "notes" from the interview to Socha prior to his trial. In this Court, the state notes that the prosecutor's failure to disclose was inadvertent. That may be so, but the Supreme Court held in *Giglio v. United States*, 405 U.S. 150, 154 (1972), it makes no difference "whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor." The state also suggests that we should make something of the fact that the prosecutor shared the transcript and recording with Holm's counsel. But any such sharing is neither here nor there. *Brady* does not exempt a prosecutor from disclosure when the prosecutor has given evidence to a co-defendant—especially an adversarial co-defendant, as Holm surely was. It is also unrealistic to expect defense counsel to ask for the transcript of an interview he knows nothing about. While Socha had received a police report vaguely mentioning a separate interview of Swanson on a different date, the record is devoid of evidence that he knew about Swanson's April 11 statements to Holm. See *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001) (access to a witness does not *per se* mean a reasonably diligent defense lawyer has access to all the witness's knowledge). Furthermore, the state previously conceded that this evidence, if material, would need to be disclosed to Socha. Tr. 7/7/2005, R. 106–10, at 86–87; see *Crivens v. Roth*, 172 F.3d 991, 997 (7th Cir. 1999) (grounding

its finding that evidence was withheld in part on the state's concession that *Brady* required disclosure). Clearly established Supreme Court law requires the conclusion that the Swanson interview was "suppressed" as *Brady* uses the term.

C

That brings us to materiality. Evidence is "material" under *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* Impeachment evidence is not material if it is "merely cumulative." *United States v. Dweck*, 913 F.2d 365, 371 (7th Cir. 1990). Additional evidence describing a co-conspirator's criminal nature may not be material when the witness's credibility has already been impugned. See *United States v. Ervin*, 540 F.3d 623, 632 (7th Cir. 2008). This is particularly true when the witness who would be impeached by the evidence at issue was not the only one to testify about the existence of a conspiracy. See *id.*

The Wisconsin Court of Appeals found, as the state trial court had done, that the Swanson interview was "inconsequential." It first noted that the Swanson interview included both inculpatory and exculpatory information. Had the exculpatory portions been introduced into evidence, it is a safe bet that the state would have introduced the inculpatory statements, such as the one labeling Socha as a "major player" in the murder. For what it is worth (which may not be very much), the state judge who conducted the bench trial ruled on the post-conviction motion that this interview would not have changed his mind.

Second, it is not as if the Swanson interview provided the only fodder for impeaching Holm. To the contrary, there was ample impeachment evidence against him, including his significant criminal history and his guilty plea to the offense of murder.

Third, and most importantly, Holm's testimony was not the only evidence of Socha's involvement in the conspiracy. Even if Holm was the state's star witness, his testimony did not stand alone. Other witnesses provided ample evidence to support a guilty verdict. Most damaging is Drews's testimony. He said things such as "[a]nd between me and Victor and Thomas … Socha and Beth, we decided that Lance needed to die," and "See, I remember Tom being there when the decision was made to kill Lance." Mrazik testified that she overheard Socha say that if they were planning to kill someone (which she understood meant Leonard), they should use buckshot. A bartender witnessed a meeting among Socha, Holm, Drews, and Mrazik at a time just before the murder, when Socha was allegedly out of town. They fell silent every time she drew near.

The state also presented a significant amount of evidence that Socha acted suspiciously after the police began investigating. A friend testified that Socha got "upset" about Leonard's murder and was considering leaving town.  Mrazik testified to threats Socha made to her and to Holm. A friend confirmed that during one of these encounters, Socha confronted Holm with a gun. Given the incriminating material in the interview and the significant amount of evidence pointing to Socha's guilt aside from Holm's testimony, the Wisconsin

Court of Appeals reasonably concluded that any *Brady* violation that occurred was not material, in that it did not undermine the court's confidence in the verdict.

### III

It is always regrettable to see a failure to comply with an obligation as basic as the *Brady* rule, which is hardly new. Nevertheless, the question before us is only whether the Wisconsin Court of Appeals acted unreasonably when it found that the evidence in question was not, on this record, material. Its conclusion was not unreasonable, and so we AFFIRM the judgment of the district court denying Socha's petition for a writ of habeas corpus.