In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 16-1275, 16-2260, 16-3084, & 16-4212

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TORRIE KING, *et al.*,

*Defendants-Appellants.*

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:13-cr-00772 — **Elaine E. Bucklo**, *Judge.*

_____

ARGUED SEPTEMBER 7, 2018 — DECIDED DECEMBER 6, 2018

_____

Before FLAUM, RIPPLE, and BARRETT, *Circuit Judges.*

BARRETT, *Circuit Judge.*  Nathaniel Hoskins, Julian Martin, and Torrie King were members of the Imperial Insane Vice Lords, a gang in Chicago. Following a multi-year investigation into the gang's activities, they were prosecuted together in a bench trial and convicted on several counts. After trial and before sentencing, the government disclosed evidence that it had obtained from a confidential informant.

The district court held that the late disclosure did not violate *Brady v. Maryland*, 373 U.S. 83 (1963), because the suppressed evidence was neither exculpatory nor material. All three defendants appeal that ruling. In addition to the joint *Brady* claim, Martin raises two issues that are unique to him: he argues that the district court violated the Confrontation Clause when it admitted a statement made by a non-testifying codefendant and that the district court made several errors when it imposed his sentence. Neither the defendants' joint claim nor either of Martin's individual claims warrants reversing the district court.

## I.

This case arises from the operations of the Chicago gang known as the Imperial Insane Vice Lords ("Vice Lords"). The gang controlled drug operations near Thomas Street and Keystone Avenue on the west side of Chicago. In late 2010, the government began investigating the gang's activities, which led to the indictment of two dozen people for various offenses, including racketeering conspiracies, firearm offenses, narcotics offenses, and murder. Among the indicted were the defendants in this case: Nathaniel Hoskins, Julian Martin, and Torrie King. Their two-week joint bench trial produced a vast record; here, we discuss only the small slice relevant to this appeal.

First, trial testimony described the gang's hierarchy. The head of the Vice Lords was known as the "King." The hierarchy also included other important positions such as the Don (second in command), the Prince (third in command), and Five Star Universal Elites (those who ranked above an average Vice Lords member). During the time of the alleged conspiracy, Martin served as the Prince and Hoskins was

vying to be the King. Former gang member Darrell Pitts and special agent William Desmond testified that the Vice Lords held meetings, controlled certain areas, and used punishments to maintain control over lower-level members. This was corroborated by intercepted gang member calls. And evidence showed that Hoskins, Martin, and King participated in these gang actions.

Second, Vice Lords member and codefendant Raymond Myles testified that Martin provided him with a weapon and ordered him to kill a man named Tony Carr. Myles testified that he didn't know Carr and that Martin didn't explain why he wanted Carr killed. Myles ultimately didn't go through with the murder—he said that he got cold feet—and beat Carr with the gun instead.

Third, the government presented evidence that Vice Lords member Andre Brown murdered a man named Marcus Hurley. The evidence included surveillance footage of the actual murder, along with circumstantial evidence indicating that it was committed in retaliation for an incident involving members of the Four Corner Hustlers ("Hustlers"), a gang with whom the Vice Lords had an ongoing feud. Recorded calls showed both that Hoskins, Martin, and King sought to shelter Brown following the murder and that Hoskins took credit for it. The government also introduced a post-arrest statement that Hoskins had given to Investigator Andrew Marquez, which included information about the murder. Marquez testified that Hoskins told him that he was with Martin, Brown, and others following the murder of Hurley and that Brown informed them that he had killed Hurley.

Finally, evidence showed that Martin and King plotted to kill another Hustlers gang member, Brian Smith. Martin also

recruited Myles to help with this job. But when Martin, King, and Myles arrived at the place where they planned to kill Smith, law enforcement—wise to the plot courtesy of previous wiretaps—arrived and forced them to abandon the plan.

The defendants were each convicted on multiple counts. The ones relevant to this appeal are the following: the district court found all three defendants guilty of racketeering conspiracy and conspiracy with intent to distribute, Hoskins guilty of conspiracy to murder in aid of racketeering activity, and Martin and King each guilty of being an accessory after the fact to murder. It found Martin and King not guilty of attempting to murder Smith in furtherance of the conspiracy.

After the bench trial but before sentencing, the government disclosed to the defendants reports from the Drug Enforcement Administration about D.J., an alleged former leader of the Vice Lords who became a confidential informant on the gang's activities. The materials showed, among other things, evidence of infighting within the Vice Lords. After the disclosure, Martin and Hoskins moved for a new trial, contending that the government's failure to timely disclose this information amounted to a *Brady* violation. *See Brady v. Maryland*, 373 U.S. 83 (1963).[1] The district court denied the defendants' motions because it found the new evidence to be neither material nor exculpatory. The defendants proceeded to sentencing.

King was sentenced first. Even though King and Martin had not been convicted of attempting to murder Smith, the

---

[1] King did not move for a new trial below because he had already filed his notice of appeal when the government disclosed the new reports.

court still had to determine whether to consider it in sentencing King. After a hearing, the court held that the attempt was not relevant conduct because the government had failed to establish by a preponderance of the evidence that it had been undertaken to further the conspiracy. It gave King an above-guidelines sentence of 230 months.

Hoskins was sentenced next. The district court sentenced him to life imprisonment, which was within the guidelines range.

Martin was sentenced last. At his sentencing, the court made two decisions that matter here. First, the court reversed course and found that Martin and King's attempted murder of Smith had in fact been committed to further the conspiracy. The court acknowledged that this finding contradicted its earlier finding on the same issue in King's sentencing. It explained, however, that it had become convinced that its initial ruling was wrong and added that it probably would have given Martin the same sentence anyway. Second, the court concluded that the attempted murder of Carr was relevant conduct because it had been committed to further the conspiracy. Martin received a sentence of 310 months, which was below his guidelines range of 360 months to life.

Before us, the defendants jointly make one argument: that the district court erred in denying them a new trial to remedy the alleged *Brady* violation. Martin makes two individual claims: (1) that the district court violated the Confrontation Clause and (2) that the district court erred at sentencing by finding that the attempted murders of Smith and Carr aimed to further the conspiracy.

II.

The defendants contend that they are entitled to a new trial because the government failed to disclose the information about D.J., the confidential informant, before trial. *See Brady*, 373 U.S. 83. We review a district court's denial of a motion for new trial based on a *Brady* claim for abuse of discretion. *United States v. Walter*, 870 F.3d 622, 629 (7th Cir. 2017). The government argues that King should have to prove plain error because he failed to move for a new trial below; King retorts that he had already filed his notice of appeal when the government provided the *Brady* material, so he couldn't have moved for a new trial. Because King's claim fails even under the less stringent abuse of discretion standard, we need not resolve this dispute.

To establish a *Brady* violation, a defendant must show that the evidence is "(1) favorable, (2) suppressed, and (3) material to the defense." *Id.* (internal quotation marks omitted). Because the government does not contest that it suppressed the evidence, we consider only whether it was favorable and material.

Evidence is favorable if it is either exculpatory or impeaching. *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017). We have stated that "[e]vidence need only have 'some weight' or 'tendency' to be favorable to the defendant." *United States v. Ballard*, 885 F.3d 500, 504 (7th Cir. 2018) (quoting *Kyles v. Whitley*, 514 U.S. 419, 451 (1995)). The defendants assert that because the new evidence showed infighting within the Vice Lords—such as one member ordering the shooting of another and a member switching his drug supplier to a rival gang—it demonstrates that no

enterprise or conspiracy existed.[2] Their argument is grounded in the principles that individuals acting "independently and without coordination" do not constitute an enterprise under RICO, *Boyle v. United States*, 556 U.S. 938, 947 n.4 (2009), and that a conspiracy typically requires cooperative relationships seeking to achieve common goals, *United States v. Townsend*, 924 F.2d 1385, 1395 (7th Cir. 1991). Because the new evidence carries "some weight" in favor of the defendants on these points, they clear the "favorability" hurdle.

That leaves materiality. The standard for materiality is whether there is "a reasonable probability" that the outcome would have been different if the evidence had been disclosed. *Walter*, 870 F.3d at 630. The defendants contend that the new evidence would have allowed them to call DEA agents to testify about the constant infighting within the Vice Lords and about the fact that a confidential informant had led the Vice Lords for several years.[3] They argue that this would have cast doubt on the government's efforts to prove an enterprise or conspiracy, which in turn would have "put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

---

[2] Because proof of an enterprise or conspiracy is necessary on only three of the counts on which the defendants were found guilty, the defendants' *Brady* argument goes solely to their racketeering conspiracy convictions, their conspiracy to possess with intent to distribute convictions, and Hoskins's conspiracy to murder in aid of racketeering activity conviction.

[3] The government argues that the evidence must be admissible to be material under *Brady*. *See United States v. Morales*, 746 F.3d 310, 314–15 (7th Cir. 2014) (noting a circuit split on this issue). Because the defendants' claim here fails either way, we need not address this question.

But neither the evidence of infighting nor the fact of D.J.'s cooperation would have put the case in a different light. As for the evidence of infighting, the defendants already tried and failed to persuade the district court that infighting is inconsistent with the existence of an enterprise or conspiracy. For example, defense counsel asked one of the special agents during cross-examination whether individuals were "working for themselves … [or had] their own agenda when they were out on the street." The special agent answered that individuals sometimes had their own goals in mind. And the district court noted that the Vice Lords acted as a unit despite changes in membership and leadership—and even though "Hoskins was not always obeyed." The belatedly disclosed evidence is simply more of the same, and cumulative evidence does not justify a new trial under *Brady*. *United States v. Ervin*, 540 F.3d 623, 631 (7th Cir. 2008).

As for D.J.'s cooperation, the presence of a turncoat—like the evidence of infighting—is not inconsistent with the existence of an enterprise or conspiracy. An enterprise need only have a "purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946. D.J.'s cooperation does not undermine confidence in the district court's conclusion that the Vice Lords satisfied this definition: the gang had a sustained hierarchy that persisted over a ten-year period and its members worked toward common objectives. The fact that someone within the gang reported on its hierarchy, members, and objectives bolsters rather than undercuts proof that the enterprise or conspiracy existed.

The defendants also claim that they could have used the new evidence to cross-examine and impeach Pitts and Myles about the gang infighting. We have explained before that newly discovered impeachment evidence is not ordinarily material. *United States v. Brown*, 865 F.3d 566, 574 (7th Cir. 2017). Regardless, this evidence does not help the defendants. As an initial matter, the defendants don't identify any differences between it and the prior testimony of Pitts and Myles. Even if they could, however, the impeachment evidence is cumulative of what the district court already learned during the trial. Like substantive evidence, "impeachment evidence is not material if it is 'merely cumulative.'" *Socha v. Richardson*, 874 F.3d 983, 989 (7th Cir. 2017) (quoting *United States v. Dweck*, 913 F.2d 365, 371 (7th Cir. 1990)).

The final and weakest piece of the *Brady* claim comes from Martin, who argues that he could have used the suppressed evidence from D.J. to impeach Carr and that impeaching Carr would have affected his sentence. According to Martin, the government's suppression deprived him of the opportunity to explain that Carr was part of a gang and that Faulkner wanted to take over his drug spot. This argument is a non-starter—the evidence is not exculpatory, much less material.

In short, the district court did not abuse its discretion in concluding that the belatedly disclosed evidence failed to create a reasonable probability of a different result.

### III.

Having disposed of the defendants' collective *Brady* claim, we now turn to Martin's two individual claims. We begin with his argument that the district court violated his Sixth

Amendment right to confront the witnesses against him. After he was arrested, Hoskins gave a statement that incriminated both himself and Martin in the murder of Marcus Hurley, and Investigator Marquez related the contents of this statement at trial. Because Hoskins didn't testify at trial, Martin had no opportunity to cross-examine him. Martin argues that the introduction of Hoskins's statement therefore violated *Bruton v. United States*, 391 U.S. 123 (1968), and that he is entitled to a new trial on the charge that he was an accessory after the fact to Hurley's murder.

The Confrontation Clause renders the confession of a non-testifying codefendant altogether inadmissible in a jury trial if it implicates the defendant. *Bruton*, 391 U.S. at 135–37. This rule seeks to protect defendants from jurors who may be incapable of understanding or abiding by the instruction that they can consider the statement as evidence against one defendant but not the other. Martin, however, had a bench trial—and we have held that the blanket rule of *Bruton* "is simply inapplicable" in that context. *Faulisi v. Pinkney*, 611 F.2d 176, 178 (7th Cir. 1979). Because judges, unlike jurors, are skilled at distinguishing between permissible and impermissible uses of evidence, the rationale for *Bruton* does not apply when a court, rather than a jury, serves as the factfinder. *Id.*; *see Rogers v. McMackin*, 884 F.2d 252, 257 (6th Cir. 1989) ("To apply *Bruton* to bench trials would be to conclude that judges, like jurors, may well be incapable of separating evidence properly admitted against one defendant from evidence admitted against another.").

To be sure, judges are not infallible; sometimes, they make mistakes. The Supreme Court addressed that circumstance in *Lee v. Illinois*, in which it held that a judge's reliance on a non-

testifying codefendant's pretrial confession as evidence against the defendant violated the Confrontation Clause. 476 U.S. 530, 542–43 (1986). But despite Martin's argument to the contrary, *Lee* does not render *Bruton* applicable to bench trials. Rather than presuming that judges suffer from the same incapacity as jurors, *Lee* simply enforces the bedrock rule that absent an opportunity for cross-examination, the Confrontation Clause prohibits the use of out-of-court testimony as substantive evidence against the accused. *See Johnson v. Tennis*, 549 F.3d 296, 300–01 (3rd Cir. 2008) (rejecting "the notion that *Lee v. Illinois* expanded the *Bruton* doctrine to encompass bench trials" (citation omitted)); *Rogers*, 884 F.2d at 257 ("We do not agree that *Lee* made *Bruton* applicable to bench trials."). *Lee*, which deals with judges, rather than *Bruton*, which deals with juries, controls.

The question, then, is whether the district court relied on Hoskins's unexamined confession to find him guilty of being an accessory after the fact to murder. Martin says that it did, but the record doesn't support that assertion. Before Marquez's testimony, the district court acknowledged that it could not use those statements against Martin because Hoskins did not testify. And when it found Martin guilty of this charge, the court stated:

> The evidence … [is] the photographs of [Martin and King] with Mr. Brown in the days after the murder. And, more important, the tapes, where both admit they are hiding him and, in Martin's case, helping Brown change his appearance. Martin also paid for his room at the Red Roof Inn. … I'll also add that both of them were with Brown right after the murder, within an hour of

> it, where Mr. Brown has suddenly changed his clothes. So all of this shows to me, beyond a reasonable doubt, that they knew why they were hiding Mr. Brown.

Trial Tr. 1409–10. This reasoning reveals that the district court relied on photographs, tapes, testimony from officers, and other circumstantial evidence. Because the district court did not use Hoskins's pretrial confession against Martin, it did not violate Martin's confrontation right. And because the district court did not rely on Hoskins's statement in finding Martin guilty, Martin's secondary argument—that Hoskins's statement was unreliable—similarly goes nowhere.

## IV.

Martin also contends that the district court clearly erred by treating the attempted murders of Smith and Carr as relevant conduct at sentencing. Acquitted or uncharged offenses constitute relevant conduct if they "occurred during the commission of the offense of conviction." U.S.S.G. § 1B1.3(a)(1). They must be proven by a preponderance of the evidence, *see United States v. Waltower*, 643 F.3d 572, 574 (7th Cir. 2011), and we review a district court's finding regarding relevant conduct for clear error, *United States v. Salem*, 597 F.3d 877, 884 (7th Cir. 2010).

## A.

We start with the attempted murder of Smith. At King's sentencing, the district court concluded that the government had not proven by a preponderance of the evidence that the attempted murder of Smith was committed in furtherance of the conspiracy. But at Martin's sentencing several months

later, it reached the opposite conclusion, explaining that it had erred at King's sentencing.

Martin says that the court clearly erred because its factual finding at his sentencing directly contradicted its finding at King's sentencing. *See United States v. Barnes*, 602 F.3d 790, 797 (7th Cir. 2010) ("Without any justification for why one co-conspirator is responsible for a greater quantity of drugs than his fellow co-conspirators, such a discrepancy in factual findings is clearly erroneous."). We stress that the court's obligation to avoid conflicting findings does not require it to adhere to a previous mistake; so long as it adequately explains why it was wrong in one sentencing but right in the other, it can rectify the error. *See United States v. Block*, 705 F.3d 755, 761–62 (2013) ("We never held that trial courts cannot consider new evidence in sentencing a defendant after making an earlier drug quantity determination for his co-conspirator."). The court did so here. It explained that it had incorrectly analyzed the attempted murder at King's sentencing by asking whether the attempt was "logical" rather than whether it aimed to further the conspiracy. Under the correct analysis, the result changed. Martin had discussed or hinted at the attempted murder—both before and after it happened—on at least four phone calls with other members of the Vice Lords. For example, in one recording, Martin explained the situation to fellow member Kenyatta McLaurin. He told McLaurin that the murder was "some shit we [the Vice Lords] had set up." What's more, Smith was a former member of the Hustlers gang—a gang engaged in an ongoing and deadly feud with the Vice Lords. The court held that these pieces of evidence established by a preponderance standard that Martin attempted to murder Smith to further the conspiracy. That conclusion isn't clearly erroneous.

Martin lodges one last attack on this aspect of his sentence: he contends that even if the facts support the district court's finding, the disparity between his sentence and King's renders his sentence substantively unreasonable under 18 U.S.C. § 3553(a)(6). We review the reasonableness of a defendant's sentence for abuse of discretion. *United States v. Harris*, 791 F.3d 772, 782 (7th Cir. 2015). Reasonableness under § 3553(a)(6) depends on, among other things, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." When it performs that analysis, a district court may—"if it wishes"—consider sentencing disparities between two codefendants. *United States v. Solomon*, 892 F.3d 273, 278 (7th Cir. 2018). Because, however, the sentencing guidelines derive from national patterns, we have also held that a properly calculated guidelines recommendation necessarily considers the "consistency between similarly situated defendants." *United States v. Grigsby*, 692 F.3d 778, 792 (7th Cir. 2012). In this case, the district court properly calculated Martin's sentence, the sentence was below the guidelines range, and the district court provided sufficient reasons for the disparity between Martin's and King's sentences by admitting error. Thus, it was not substantively unreasonable. *See United States v. Trudeau*, 812 F.3d 578, 594 (7th Cir. 2016) (asserting that "[a] below-guidelines sentence will almost never be unreasonable."); *United States v. Shamah*, 624 F.3d 449, 460 (7th Cir. 2010) ("A within guidelines sentence necessarily gives weight and consideration to avoiding unwarranted sentencing disparities.").

B.

Martin also argues that the district court clearly erred in treating the attempted murder of Carr as relevant conduct at sentencing. We disagree. Evidence showed that the attempted murder was committed to further the conspiracy.

First, Myles testified at trial that Martin gave him a gun and asked him to kill Carr. Second, both Myles and Martin were members of the Vice Lords. And third, Martin was Myles's superior within the gang's hierarchy. These facts support the district court's conclusion that attacking Carr was gang-related. In addition, former Vice Lords leader Faulkner had previously made an attempt on Carr's life so that he could take over Carr's drug spot at Division and Pulaski. In fact, Faulkner was facing charges related to an attempt on Carr's life at the time of the second attempted murder (and Carr was planning to testify against him). Carr was no stranger to the Vice Lords. Given this evidence, we do not think that the district court clearly erred in concluding that attempting to murder Carr aimed to further the conspiracy. *Compare United States v. Garcia*, 754 F.3d 460, 472 (7th Cir. 2014) (concluding that violence aided racketeering activity because the order "went through [the gang's] chain of command[,] it was implemented by subordinates," and it followed the gang's practices), *with United States v. Thai*, 29 F.3d 785, 818 (2d Cir. 1994) (concluding that violence did not aid racketeering activity when there was "no evidence from which the jury could conclude that [defendant's] motive … was other than purely mercenary").

* * *

We AFFIRM the judgments of the district court.