In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-1747

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GARY SOLOMON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 15 CR 00620-2 — **Edmond E. Chang**, *Judge.*

ARGUED DECEMBER 5, 2017 — DECIDED JUNE 5, 2018

Before WOOD, *Chief Judge*, and ROVNER and HAMILTON, *Circuit Judges.*

WOOD, *Chief Judge*. Hard as it may try, Chicago has not yet managed to shake free from the scourge of public corruption. Gary Solomon, Thomas Vranas, and Barbara Byrd-Bennett have added another chapter to this inglorious history. As CEO of the Chicago Public Schools (CPS), Byrd-Bennett worked behind the scenes to assure that two companies headed by Sol-

omon and Vranas would receive lucrative contracts. In ex-
change, Solomon and Vranas agreed that they would pay
Byrd-Bennett a percentage of the revenue generated by those
contracts when she came to work for them at the end of her
tenure with CPS. After the fraudulent scheme was exposed,
each participant pleaded guilty to committing wire fraud in
violation of 18 U.S.C. §§ 1343 and 1346. Solomon was sen-
tenced to 84 months' imprisonment, 30 months more than
Byrd-Bennett received. Solomon's sentence also significantly
exceeds Vranas's, though that gap is irrelevant for this appeal.

Solomon wants a new sentencing hearing. He accuses the
district court of incorporating the value of a contract unre-
lated to the criminal agreement into his advisory sentencing
guidelines calculation. That alleged error resulted in an of-
fense score that was four levels higher than Solomon believes
it should have been. Additionally, Solomon believes that the
disparity between Byrd-Bennett's sentence and his sentence is
unwarranted, making his sentence substantively unreasona-
ble. Because the record supports the court's decision to in-
clude the contested contract in the offense level calculation,
and because dissimilar cooperation is a reasonable basis for a
sentencing disparity, we affirm the district court's sentence.

**I**

Before she joined CPS in May 2012, Byrd-Bennett briefly
consulted for a pair of companies (The SUPES Academy, LLC,
and Synesi Associates, LLC) to which we refer as SUPES.
SUPES provided training services for educators. Solomon was
its CEO, and Vranas its President. Byrd-Bennett's consulting
role with SUPES entitled her to a percentage of the companies'
revenue. When Byrd-Bennett assumed her public positions,
first consulting for CPS and later as its CEO, her relationship

with SUPES persisted, despite the fact that as an agent of CPS she was not allowed to have an economic interest in any vendor contracts. Byrd-Bennett used her authority as the head of CPS to ensure that SUPES won two lucrative contracts. The first, ultimately valued at $2.54 million, was awarded within two weeks of her taking over the top job for the school district. The second followed her ascension by eight months and was worth $20.5 million. Each was a sole-source contract—meaning it was a contract for which there could be only one bidder.

In exchange for this largesse, Solomon and Vranas deposited a percentage of the revenue generated from those contracts into trusts for the benefit of Byrd-Bennett's two grandsons. The plan was that once she finished with her CPS service, she would return to SUPES and receive control of the trusts as a "signing bonus." SUPES also set aside revenue into a "development fund," a portion of which was earmarked for Byrd-Bennett, again to be paid on her return to SUPES.

As Robert Burns observed, "The best laid schemes o' mice an' men/Gang aft a-gley." So it was here. No more than a month after the second contract was awarded, the Inspector General for the Chicago Board of Education launched an investigation into Byrd-Bennett's relationship with SUPES. As Vranas would later admit, he and Solomon deleted emails sent between them and Byrd-Bennett when they learned about the investigation. Almost two years to the day of Byrd-Bennett's taking the reins as CEO, a grand jury returned a 23-count indictment against Solomon, Vranas, and Byrd-Bennett. They were charged with, among other things, a scheme to obtain public money through bribery and kickbacks. All three defendants pleaded guilty on one count.

At Solomon's sentencing hearing, he and the government disagreed about the scope of the fraudulent arrangement. He argued that his agreement with Byrd-Bennett reached only the first of the two contracts SUPES received, while the government countered that the agreement remained in force through the second contract. If Solomon was right, the value of the monetary benefit he and Vranas received from the scheme, calculated as the profit earned from each contract, was $508,000. If the government was right, the benefit was $2.9 million. This translated, for purposes of the U.S. Sentencing Guidelines, into a difference of four levels in the required enhancement to the baseline offense score of 12, see U.S.S.G. § 2C1.1(a)(2), from 12 additional levels to 16, see U.S.S.G. §§ 2B1.1(b)(1), 2C1.1(b)(2). Solomon did not dispute the government's benefit calculation if the second contract was found to be part of the agreement.

The district court found that the evidence backed the government. After adding another four levels because the scheme involved a public official in a high-level position, U.S.S.G. § 2C1.1(b)(3), plus two more levels for obstruction of justice, U.S.S.G. § 3C1.1, and then subtracting three levels for acceptance of responsibility, U.S.S.G. § 3E1.1(a), (b), the court found a final offense level of 31. Together with Solomon's Criminal History Category I, this yielded an advisory sentencing range of 108–135 months. After weighing the sentencing factors outlined by 18 U.S.C. § 3553(a), the court selected a final sentence of 84 months' incarceration.

Though Byrd-Bennett was still awaiting sentencing at the time of Solomon's hearing, the district court discussed her and Solomon's relative culpability. The government acknowledged that had all things been equal, it would have preferred

that Byrd-Bennett receive a harsher sentence than Solomon. And indeed, the advisory guidelines sentence for Byrd-Bennett, which accounted for the fact that she was a public official, was 135–168 months. But the government advised the judge that it supported a higher sentence for Solomon. It did so in large part because of Byrd-Bennett's much more extensive cooperation with the investigation—cooperation that the government intended to reward through the filing of a motion under U.S.S.G. § 5K1.1 at the appropriate time. Moreover, Solomon profited immediately from the scheme. While Byrd-Bennett was promised a payout, she never actually saw those dollars, because they were not supposed to be paid until she returned to SUPES. In the end, the court sentenced Byrd-Bennett to 54 months' imprisonment.

## II

Solomon first challenges the district court's finding that the $20.5 million contract was part of the criminal agreement between him and Byrd-Bennett. This was a finding of fact, and so we review it for clear error. *United States v. Coscia*, 866 F.3d 782, 801 (7th Cir. 2017). The district court needed to find by a preponderance of the evidence that the second contract was part of the bribery scheme. See *United States v. Holton*, 873 F.3d 589, 591–92 (7th Cir. 2017). If so, it was properly incorporated into the offense level calculation.

Solomon pleaded guilty to the version of wire fraud that covers "a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. To convict someone of honest-services fraud, the government must prove that there is an agreement to pay a bribe or kickback. *Skilling v. United States*, 561 U.S. 358, 408–09 (2010). As the district court observed, this reaches schemes that involve a

stream of benefits over time, not just singly negotiated deals. See *Ryan v. United States*, 688 F.3d 845, 852 (7th Cir. 2012); see also *United States v. Wright*, 665 F.3d 560, 568 (3d Cir. 2012) ("The bribery theory does not require that each *quid,* or item of value, be linked to a specific *quo,* or official act."). Consequently, the district court did not have to find an explicit agreement to exchange payment for awarding the second contract. It was enough to find sufficient evidence of an ongoing agreement to compensate Byrd-Bennett for sending contracts to SUPES, and that this agreement was still active at the time SUPES won the $20.5 million contract.

The district court primarily relied on three pieces of evidence in this respect. First, Byrd-Bennett sent Solomon an email five days after SUPES won the $20.5 million contract. In that email, she wrote that "anything u can provide to me or a designated person relative to the future college and weddings for the boys might be helpful." The district court interpreted that email as demonstrating that the agreement to fund trusts for Byrd-Bennett's grandsons in exchange for awarding contracts to SUPES was still in place at the time. Second, Byrd-Bennett steamrolled internal resistance to ensure that SUPES received the $20.5 million contract. She pressured CPS officials to find money to fund the program; she shepherded SUPES through CPS's sole-source contract process; and she strong-armed a CPS employee who raised concerns about the procurement process to resign. Third, the district court highlighted evidence that Solomon and Vranas had deleted emails about the $20.5 million contract upon learning about the Inspector General's investigation. It regarded those deletions as evidence of their consciousness of guilt.

Solomon sees the evidence differently. He relies heavily on Byrd-Bennett's testimony before the grand jury, where she denied that the $20.5 million contract was part of her agreement with Solomon. He criticizes the evidence contradicting her account as nothing but "speculation and conjecture." But Solomon's position suffers from at least two faults. First, the district court found Byrd-Bennett's testimony incredible, observing at sentencing, "I think ultimately you and Ms. Byrd-Bennett are—you're fooling yourselves a little at this point, you know, after the fact, that this 20.5 was not part of the bribery scheme." Second, even if Byrd-Bennett's testimony were believable, she never negated the facts on which the district court relied. Solomon ignored those facts in his opening brief, waiting until his reply to comment on a few of them. He argues that the district court misconstrued the import of the email Byrd-Bennett sent following the second contract. The email, Solomon insists, sought payment from SUPES for the contract that had been finalized eight months earlier, and not the contract won five days prior. Even if this argument were not made too late (and it was), it is far-fetched. It was not clearly erroneous for the district court to find that the email was about the $20.5 million contract. Additionally, Solomon fails to address Byrd-Bennett's efforts to secure the second contract for SUPES. While it might be argued that Byrd-Bennett was so tenacious because she genuinely believed in the value of SUPES's services, Solomon has not pressed that argument on appeal, and it fails in any event to take into account her conflict of interest.

Compounding Solomon's problems is the additional evidence in the record indicating that the bribery scheme was alive and well at the time the $20.5 million contract was finalized. Shortly after CPS awarded the large contract to SUPES,

Solomon emailed Vranas telling him that Byrd-Bennett had called to celebrate. Two days later, as CPS and SUPES were preparing to pitch the contract to the CPS Board, Byrd-Bennett wrote to Solomon "I obviously have a very personal interest in our success. So much on many levels will be impacted now and in the future." Neither email is a smoking gun, but both buttress the district court's findings.

Solomon may be right that it is a stretch to see the evidence of his and Vranas's deletions of emails as an indication that the $20.5 million contract was part of the bribery scheme. That evidence is in the record because Vranas confessed to the deletions while making a proffer to the FBI. We do not know the content of the deleted emails. Deleting emails might display a general consciousness of guilt, but it does not speak to the scope of the illegal agreement. Yet any error in this respect was harmless. Even without the evidence of the deletions, there was ample evidence to support the court's finding by a preponderance of the evidence that the $20.5 million contract was properly included.

## III

Next, Solomon argues that the disparity between his and Byrd-Bennett's sentence was unwarranted and that this disparity renders his sentence substantively unreasonable. "We review the reasonableness of a sentence for an abuse of discretion … and note that a below-guidelines sentence is 'presumptively reasonable against an attack by a defendant claiming that the sentence is too high.'" *United States v. Harris*, 791 F.3d 772, 782 (7th Cir. 2015) (quoting *United States v. Lidell*, 543 F.3d 877, 885 (7th Cir. 2008)). A defendant rebuts the pre-

sumption only by showing that the sentence does not comport with the factors outlined in 18 U.S.C. § 3553(a). *United States v. Durham*, 645 F.3d 883, 897 (7th Cir. 2011).

A sentence might be unreasonable if it creates "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). If a district judge "correctly calculated and carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities." *Gall v. United States*, 552 U.S. 38, 54 (2007). But the guidelines are not a straitjacket. A district court is entitled, if it wishes, to apply the rule against unwarranted disparities to co-defendants' sentences. See *United States v. Statham*, 581 F.3d 548, 556 (7th Cir. 2009) ("We are therefore open in all cases to an argument that a defendant's sentence is unreasonable because of a disparity with the sentence of a co-defendant … ."). Indeed, in *Gall* the Supreme Court approved a district court's decision to take into account the sentences that co-defendants had received. 552 U.S. at 55–56; see *Statham*, 581 F.3d at 556. We take this opportunity to clarify that the district court's discretion extends this far—a point that may not be as clear as it should be in light of language in some of our decisions. See, *e.g.*, *Durham*, 645 F.3d at 897 (stating that the elimination of sentencing disparities should be viewed across judges or districts, not co-defendants, but then comparing co-defendants and finding no error); *United States v. Scott*, 631 F.3d 401, 404–05 (7th Cir. 2011) (making same statement about disparities among judges and districts, but then holding that there could be no disparity among defendant and his coconspirator "when the latter does not even exist").

Solomon relies on similarities between himself and Byrd-Bennett as evidence that the sentencing disparity is unwarranted. They each pleaded guilty to the same criminal charge, they were equal partners, and they had the same criminal history score. If anything, he argues, Byrd-Bennett—the public official—is the more culpable defendant. Both the government and district court acknowledged at sentencing that in the abstract it makes sense for the public official to receive the harsher punishment. The respective advisory ranges corroborate that notion.

But sentencing is never abstract: the district court is required by statute to tailor its sentence to the particular defendant before it. And as soon as we look at the specifics, it is apparent that all things are not equal. Byrd-Bennett cooperated, and Solomon did not (at least in any meaningful way). Disparate cooperation warrants disparate sentencing. *United States v. Orlando*, 819 F.3d 1016, 1026 (7th Cir. 2016). We have held as much, even when the less culpable of co-defendants finds himself staring at the harsher sentence. See *United States v. Boscarino*, 437 F.3d 634, 637–38 (7th Cir. 2006) (finding the district court's sentencing of the more culpable of two co-defendants to a lesser term of imprisonment to be reasonable based on his cooperation).

Solomon urges that the district court erred by failing to equate his cooperation to Byrd-Bennett's. He highlights flaws in her proffers, and her initial failure to tell the truth. He adds that he was honest in his own proffers, conceded the bribery scheme as it related to the first contract, and provided valuable information. Nonetheless, a district court may accept one account of cooperation over another. *United States v. Knox*,

573 F.3d 441, 453 (7th Cir. 2009). Here, the district court credited the government's assessment. The judge remarked at sentencing, "But I also can't give you credit for coming completely clean, at least based on the facts that I have found … . You did try to cooperate. The bottom line there is that the prosecution found that the actual substantial assistance came from Ms. Byrd-Bennett and Mr. Vranas." The government reported that Solomon waited four months after he became aware of the investigation before he tried to proffer. Even then, he was not entirely forthcoming, and he sent the government to chase false leads. While Byrd-Bennett also failed to come clean initially, eventually she did so. Moreover, though it seems to have been a secondary reason for the disparity, Solomon immediately profited from the criminal agreement while Byrd-Bennett never actually pocketed her share of the revenue.

Before leaving this subject, we note that we are not disposed to accept the government's invitation to hold flatly that a sentence cannot become substantively unreasonable based upon a co-defendant's later sentence. The government reasons that if a later sentence may render an earlier one unreasonable, then the district court is put in the untenable position of having to predict the future. That may often be true, but it is not inevitable. Here, for instance, the district court was handling both cases simultaneously. Despite the sequence of the sentencing hearings, it had enough information available to it at Solomon's sentencing hearing to compare his and Byrd-Bennett's culpability. And the judge did so ably. Case-by-case consideration of this point is all that is needed.

**IV**

Though Solomon will pay a heavy price for his role in this seamy business, his sentence is based on a properly supported assessment of the scope of his criminal agreement. The court's decision to impose a harsher sentence on him than it did on Byrd-Bennett also has ample support in the record; Solomon's sentence is not substantively unreasonable. We therefore AFFIRM the district court's judgment.