In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 18-1685

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

NIKESH A. PATEL,

*Defendant-Appellant.*

———————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14-cr-00546 — **Charles P. Kocoras**, *Judge.*

———————

ARGUED MARCH 25, 2019 — DECIDED APRIL 16, 2019

———————

Before WOOD, *Chief Judge*, and FLAUM and SYKES, *Circuit Judges*.

FLAUM, *Circuit Judge*. The government charged defendant-appellant Nikesh Patel with five counts of wire fraud, in violation of 18 U.S.C. § 1343, for his role in selling $179 million in fraudulent loans to an investment advisor. Patel pleaded guilty to all five counts and delayed his sentencing date for a year while he purported to help recover funds for the victims of his scheme. But, while on bond and just days before he was

to be sentenced, Patel attempted to flee the United States and seek political asylum elsewhere; agents arrested him just before he boarded a chartered flight to Ecuador. The district court then sentenced Patel to 25 years' imprisonment followed by 3 years' supervised release. Patel appeals, arguing that his sentence is both procedurally and substantively unreasonable. We affirm.

## I. Background

### A. Patel's Fraud

In 2011, Patel formed First Farmers Financial LLC ("First Farmers") with coschemer Timothy Fisher. Patel, located in Florida, was the company's CEO; Fisher, a California banker working at Wells Fargo, was its President and COO. First Farmers was certified as a nontraditional lender engaged in USDA government-guaranteed lending programs, including the Business and Industry Guaranteed Loan Program. Under this program, the USDA guaranteed a percentage of a loan issued to a borrower engaged in an eligible business that improved rural communities in specified ways. To obtain its certification for this program, Patel and Fisher created and submitted documents to the USDA falsely representing the financial condition of First Farmers.

As an eligible lender, First Farmers ostensibly originated and funded loans qualifying for this program: it arranged loans on borrowers' behalves, obtained USDA guarantees for portions of loans, and collected interest and principal payments from borrowers. First Farmers could also resell the USDA-guaranteed portion of its loans to investors. Because the underlying obligations of these loans are guaranteed by the United States, they are seen as fairly risk-free investments.

Pennant Management ("Pennant") was a Milwaukee-based investment advisor that acquired USDA-guaranteed loans originated by third-party approved lenders and placed these loans into investment funds for its clients. Patel induced Pennant to acquire First Farmers loans by falsely representing that the company had millions of dollars in assets, cash on hand, and profits. None of this was true, but Patel and Fisher created false financial statements and balance sheets and provided these documents to Pennant. Based on these false documents, Pennant began investing with First Farmers.

Between May 2013 and September 2014, Patel sold twenty-six loan packages to Pennant for loans that First Farmers had purportedly issued to borrowers in Florida and Georgia. Patel represented to Pennant that First Farmers had loaned money to these borrowers and that the USDA had guaranteed a portion of those loans. First Farmers then sent the USDA-guaranteed portion of the loans to Pennant as an investment for its clients. However, all twenty-six loans were completely falsified—there was no borrower, no USDA guarantee, and no loan. Patel had forged USDA employee signatures on the loan packages, made up fake businesses as the borrowers, and created fake USDA loan identification numbers for these loan packages.

Pennant (through its clients) paid $179 million for these fake loans, wiring most of that sum to a bank account in Florida over which Patel alone had signatory authority. Patel later disbursed the money to multiple other bank accounts, some of which he controlled and some of which Fisher controlled. The two used some of the proceeds to make "principal and interest" payments back to the Pennant investors who had invested in the fund. These purportedly represented payments

from real borrowers, but those real borrowers did not actually exist. They also used approximately $26 million to buy back three other fictitious USDA loans that Patel had sold to a different investment advisor. Patel then spent another $130 million to purchase, renovate, and operate hotels, and he spent further proceeds on other business ventures, personal travel and expenses, homes, cars, a boat, and gifts for friends and family. Fisher also spent his share on himself, although Patel controlled more of the stolen funds.

### B. Patel's Indictment, Guilty Plea, and Attempted Flight

This scheme unraveled in September 2014, when Pennant employees became aware of inconsistencies relating to the First Farmers loans and were unable to verify the existence or location of certain purported borrowers. The government charged Patel in a criminal complaint with one count of wire fraud in violation of 18 U.S.C. § 1343 on September 29, 2014, and government agents arrested Patel the next day. Pennant obtained an injunction prohibiting Patel from selling or disposing of any assets; a court-appointed Overall Receiver subsequently took over collection efforts to recover funds for the victims of this fraud (*i.e.*, Pennant and its investors). *See In re First Farmers Fin. Litig.*, 14-cv-7581 (N.D. Ill.). Pennant collapsed because of the fraud, and it no longer operates as an investment advisor.

The government indicted Patel with five counts of wire fraud, in violation of 18 U.S.C. § 1343, on December 2, 2015.[1] After first pleading not guilty, Patel changed his plea to guilty

---

[1] As discussed more fully *infra*, the government charged Fisher separately with one count of money laundering in violation of 18 U.S.C. § 1957(a).

to all five counts via a plea declaration on December 6, 2016. The court accepted the plea and set Patel's sentencing for April 6, 2017.

From February 2017 through November 2017, Patel filed several motions to continue his sentencing hearing, all of which the court granted. Most of these requests were made by Patel, and granted by the court, because Patel was purportedly helping the Overall Receiver recover additional funds. Patel represented in his motions that he had various opportunities to earn more money for recovery as a consultant on development projects. For example, on November 28, 2017, Patel filed a motion to continue his sentencing because he had a "unique opportunity to earn an additional $1 million for his victims" by assisting with a redevelopment marketing study. According to the motion, this $1 million was "already sitting in Mr. Patel's attorneys' trust fund account," and the Overall Receiver's counsel supported the request for a continuance "given the opportunity Mr. Patel has to assist his victims" in their recovery. The court granted this request as it did the others and finally set Patel's sentencing date for January 9, 2018.

Three days before that, on January 6, government agents arrested Patel at an airport in Kissimmee, Florida, as he attempted to board a chartered plane to Ecuador. In his possession, Patel had an Indian passport in his name, United States currency, documents relating to his attempt to obtain asylum in Ecuador, financial documents indicating access to accounts holding millions of dollars, and detailed checklists for tasks relating to obtaining asylum in Ecuador and setting up a new life there for himself and his family.

Patel told the agents at the airport he was traveling to Ecuador because he secured political asylum there; he had also

applied for asylum in India but chose to seek it in Ecuador instead because of its extradition laws. The documents in his possession indicated Patel had planned his flight for months: he rented a house in Ecuador, opened bank accounts and transferred funds there, obtained a lawyer to help him through the extradition process, and purchased tickets for his wife and family to travel and meet him in the coming days.

The government also discovered that while on bond, instead of earning money to pay back his victims through consulting fees and redevelopment projects, Patel and another associate used fictitious identities and entities to defraud an Iowa lender out of millions of dollars. Approximately $2.2 million of the money Patel had ostensibly earned to pay back the Pennant fraud victims was newly-stolen money. And after his arrest at the Florida airport, while in custody awaiting transfer to Chicago, Patel continued to direct his associate on how to complete this pending fraud.

## C. Sentencing

After these events, the court delayed Patel's sentencing again. The hearing finally took place on March 6, 2018.

In advance of the hearing, the probation office prepared an initial Presentence Investigation Report ("PSR") on April 5, 2017 and supplemented the report twice, on October 27, 2017 and March 5, 2018. Before Patel's attempted flight, the PSR calculated his offense level as 42, which (as relevant here) included a two-level enhancement for his leadership role in the offense and a three-level reduction for acceptance of responsibility. Patel had a criminal history category of IV, resulting in a Guidelines range of 360 months' to life imprison-

ment. However, because the statutorily-authorized maximum sentence for each of the wire fraud counts in the indictment was 20 years' imprisonment, Patel's Guidelines range was limited to 360–1,200 months.

Following the flight attempt, probation adjusted Patel's offense level to 45 by including a two-level enhancement for obstruction of justice and excluding the three-level reduction for acceptance of responsibility. The two-level enhancement for Patel's leadership role in the offense remained.[2] However, the PSR treated the offense level of 45 as an offense level of 43 for calculating the applicable Guidelines range. *See* U.S.S.G. ch. 5, pt. A (Sentencing Table), app. n.2. Patel remained in criminal history category IV. Based on these calculations, Patel's new Guidelines range was life in prison, which the PSR adjusted to 100 years' imprisonment based on the statutory maximum for wire fraud. The government requested that the district court impose a sentence of 30 years.

At the hearing, Patel challenged some of the PSR calculations, including the two-level leadership role enhancement and the loss of the three-level acceptance of responsibility reduction. The district court rejected both challenges. First, the court concluded the leadership role enhancement applied: although Fisher and Patel were the only two participants in the fraud, the prime victim in the case (Pennant) dealt almost exclusively with Patel, placing him "in the cat bird's seat of impropriety." Moreover, the court noted it had "no basis … to review the discretion of the U.S. Attorney's Office in viewing

---

[2] The supplemental PSR made other adjustments to the offense level calculation that are not relevant here.

the two defendants differently" for charging purposes, so "what [Patel's] argument smacks of is selective prosecution."

The court also rejected Patel's argument that he should not lose all three points for acceptance of responsibility based on his flight attempt. The court concluded Patel's behavior did not indicate he accepted responsibility for his actions:

> [H]e is hatching plans long before February of this year, long before January of this year, to abscond from the jurisdiction and to flee and become a fugitive and to go to, of all places, Ecuador, for political reasons. And what are those reasons? He does not like the United States. Can you imagine that? He is born in this country; educated; in a good family; and, turn around and use his funds, that could be applied to the recovery of people who were victimized by his lies and deceit.

The district court thus adopted the PSR's final calculations of Patel's offense level (45), criminal history category (IV), and Guidelines range (100 years). Patel does not take issue with any of these calculations on appeal.

Patel further argued at sentencing that, based on the 18 U.S.C. § 3553(a) factors, he should receive a sentence far less than the 30 years the government requested. Chief among his arguments was that a 30-year sentence would result in an unwarranted sentencing disparity between Fisher and himself. Fisher had pleaded guilty, pursuant to a plea agreement, to one count of money laundering. As such, he faced at most a sentence of 10 years' imprisonment based on the statutory maximum for such a charge.[3] Patel argued that

---

[3] At the time of Patel's sentencing, the district court had not yet sentenced Fisher. On April 26, 2018, the court sentenced him to the statutory

this three-to-one disparity between Patel and Fisher was unjustified, as the two were nearly equally culpable in the First Farmers scheme. Patel further argued that a 30-year sentence would result in an unwarranted disparity between Patel and other fraudsters involved in schemes much larger than his. Finally, Patel addressed his attempted flight to Ecuador, saying that while it was "uncalled for" and there was "no excuse," it was not a "blank check" to impose an excessive sentence.

The court again rejected Patel's arguments. First, the court addressed Patel's flight attempt. It discussed how Patel meticulously planned this attempt, which indicated that Patel never intended to face punishment for his "massive" fraud (which, it said, reflected a certain "diabolical genius"):

> But all of the plans were laid. … "What explanation can I give Ecuador as to why I want political asylum," there is thought about that, too. And for any citizen to read that, it is a little insulting that the reason is a distaste for the country. I mean, there is a lot of things wrong with America. No two ways about that. And I am not here to wave the flag over the universe we live in here. But it is still a great country. And to turn your back on it for personal selfish reasons, to denigrate it— you know, the people are in limbo wanting to become citizens. He was born here. His citizenship was a gift of his birth. And he is so quick to throw it out because he is not going to face the piper. He is not going to

---

maximum of 10 years' imprisonment. *See United States v. Fisher*, 16-cr-717 (N.D. Ill.).

stand before me and get sentenced, because he is not going to be here.

Finally, the court rejected Patel's disparity argument: while Fisher had not yet been sentenced and it had not seen Fisher's PSR, the facts indicated Patel was "the most significant player" in the First Farmers scheme.

Before imposing the sentence, the court asked the parties "is there anything … that you think I should have addressed more carefully or fully than I have? I know you have made a lot of points." Both parties said no.

The court then sentenced Patel to 25 years' imprisonment (20 years' on Count I and 5 years' each on Counts II–V, with Counts I and II to run consecutively, and with Counts III–V to run concurrently to the first two counts), followed by 3 years' supervised release. The court also imposed restitution in the amount of $174,791,812.50. In imposing the sentence, the court acknowledged that 25 years was less than what the government asked for and "a little less than what can be and what the Guidelines say should be, because of the commonality to other cases," but the sentence recognized "the beneficial factors in [Patel's] favor under [§] 3553." Patel appeals the reasonableness of this sentence.

## II. Discussion

We review whether a district court committed a procedural error in sentencing a defendant de novo, and we review the substantive reasonableness of a sentencing decision for abuse of discretion. *United States v. Griffith*, 913 F.3d 683, 687 (7th Cir. 2019).

### A. Procedural Reasonableness

Patel claims the district court committed three procedural errors at his sentencing. First, he argues the court did not appropriately consider the need to avoid unwarranted sentencing disparities between Patel and his coschemer Fisher, and between Patel and other similarly-situated defendants. Second, he claims the district court failed to mention that it had considered all of the 18 U.S.C. § 3553(a) factors. Third, he says the district court relied on inappropriate considerations at sentencing by focusing on Patel's lack of "patriotism" and by speculating about Patel's psychological state.

When sentencing a defendant, "the district court begins by calculating the advisory guideline range, and then it applies the sentencing factors set out in 18 U.S.C. § 3553(a) to arrive at a reasonable sentence." *United States v. Figueroa*, 622 F.3d 739, 743 (7th Cir. 2010); *see also* 18 U.S.C. § 3553(a) (listing sentencing factors). A district court may commit procedural error by "fail[ing] to calculate (or improperly calculat[ing]) the Guidelines range, treat[ing] the Guidelines as mandatory, fail[ing] to consider the § 3553(a) factors, select[ing] a sentence based on clearly erroneous facts, or fail[ing] to adequately explain the chosen sentence." *United States v. Bustos*, 912 F.3d 1059, 1062 (7th Cir. 2019) (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)). The court also commits procedural error if it fails to "address all of a defendant's principal arguments that 'are not so weak as to not merit discussion.'" *United States v. Villegas-Miranda*, 579 F.3d 798, 801 (7th Cir. 2009) (quoting *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005)).

Patel first argues the district court committed procedural error by failing to consider his principal mitigation argument,

that a 30-year sentence would create unwarranted sentencing disparities between himself and both Fisher and other fraudsters. *See* 18 U.S.C. § 3553(a)(6) (courts must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").

This challenge fails. A district court's treatment of a mitigation argument "can be implicit or imprecise and does not need to be extensive," as long as we can recognize that the judge considered the argument. *United States v. Tounisi*, 900 F.3d 982, 987 (7th Cir. 2018). Although Patel argues the district court "failed to articulate a reasonable basis to conclude that Mr. Patel deserved a sentence 2.5 times greater than the maximum sentence faced by his equally-culpable co-defendant, Mr. Fisher," the court observed several times that it viewed Patel as more culpable, calling him the "most significant player" of the two and noting Patel was "in the cat bird's seat of impropriety" with respect to Pennant.

Regarding the sentences of other fraudsters, at the hearing Patel mentioned the names of four defendants around the country who had committed much larger frauds and received sentences of between 20 and 30 years. He did not, however, explain anything else about these defendants that would make them similarly situated to him: whether they had similar criminal histories and carried out their frauds in similar ways, or whether they also tried to flee while on bond. In any event, the court acknowledged that it considered the sentences of other fraudsters, as 25 years was "less than what can be and what the Guidelines say should be, because of the commonality to other cases." *See United States v. Bartlett*, 567

F.3d 901, 908 (7th Cir. 2009) ("The best way to curtail 'unwar-ranted' disparities is to follow the Guidelines."). It is clear from the sentencing transcript that Patel made the disparity argument, the government had the opportunity to respond, and the court addressed it on the record. We do not require more than that from sentencing courts. *See United States v. Gill*, 889 F.3d 373, 378 (7th Cir. 2018).[4]

Patel next argues the court procedurally erred by not men-tioning that it had considered all the § 3553(a) factors. While a sentencing court "must review the § 3553(a) factors and pro-vide a record for us to review … it need not explicitly articu-late conclusions with respect to each factor." *United States v.*

---

[4] Patel has also waived this challenge, which provides an alternative basis for affirmance. A defendant waives an appellate challenge based on failure to consider principal mitigation arguments if the sentencing court inquires of defense counsel whether they are satisfied by its treatment of their principal mitigation arguments, and defense counsel replies in the affirmative. *See United States v. Donelli*, 747 F.3d 936, 940–41 (7th Cir. 2014) (citing *United States v. Garcia-Segura*, 717 F.3d 566, 569 (7th Cir. 2013)).

Here, before imposing the sentence, the district court asked Patel's counsel if there was "anything … that you think I should have addressed more carefully or fully than I have?" Counsel responded, "No." Although the district court did not use the exact phrase "principal arguments in mit-igation" in questioning counsel, the court pointedly asked if further elab-oration of the sentence was necessary. *Cf. United States v. Morris*, 775 F.3d 882, 886 (7th Cir. 2015) (a negative response to a generic "anything fur-ther" inquiry is not enough to waive this type of appellate challenge). In response to this query, Patel's counsel expressed no concern about the dis-trict court's treatment of the disparity argument. Thus, the court had no opportunity "to clarify whether it determined that the argument was 'so weak as not to merit discussion,' lacked a factual basis, or has rejected the argument and provide a reason why." *Garcia-Segura*, 717 F.3d at 569 (quot-ing *Cunningham*, 429 F.3d at 679).

*Pulley*, 601 F.3d 660, 667 (7th Cir. 2010). Here, the court noted in imposing the sentence that 25 years' imprisonment recognized "the beneficial factors in [Patel's] favor under [§] 3553." The court also discussed at length Patel's role in the fraud in relation to Fisher, his attempted flight, and his background and family. Apart from Patel's § 3553(a)(6) unwarranted sentencing disparity argument, Patel does not identify how this discussion fails to account for any particular § 3553(a) factor. And in any event, a court need not "discuss[] the § 3553(a) factors in a checklist fashion" where its statement of reasons at the hearing is adequate, as it was here. *United States v. Banks*, 828 F.3d 609, 618 (7th Cir. 2016). Thus, there was no procedural error in his sentence on this basis.

Patel finally argues the district court procedurally erred by relying on improper factors at sentencing. Specifically, he says the court "over-emphasized Mr. Patel's flight, implying that the flight signaled a lack of patriotism and it was the lack of patriotism that should be punished," and that the court's "opining about Mr. Patel's psychological state and motivations were unsupported and inappropriate." However, neither objection has merit.

It is true that a "lengthy and disconnected lecture" involving "extended discussion of topics that are both outside of the record and extraneous to any proper sentencing consideration" could represent procedural error. *Figueroa*, 622 F.3d at 743. But that is not what happened here. The district court never uttered the word "patriotism" or indicated that a lack of it on Patel's part served as the basis for his sentence. Instead, in the court's broader discussion of whether Patel had accepted responsibility for his conduct, the court pointed to his flight attempt as proof that he had not done so.

The court's comments about Ecuador being the place that Patel sought to flee to—that it was "a little insulting that the reason" for seeking asylum in Ecuador was "a distaste for" America—were admittedly off-topic, but they do not represent the lengthy diatribe on patriotism that Patel describes. In context, the court's comments reflect its consideration of Patel's lack of remorse rather than its personal offense to Patel's choice of Ecuador as a destination. Far from accepting responsibility for his conduct after pleading guilty, Patel meticulously planned to become a fugitive in Ecuador rather than face the consequences of his conduct in the United States.

As for the court's comments regarding Patel's psychological state and motivations, such as its discussion of Patel refusing "to be called to account," and its reference to Patel as "brazen" in his conduct, these comments relate to various § 3553(a) factors that a court must consider at sentencing. *See* 18 U.S.C. § 3553(a)(1), (2)(A) (in imposing a sentence, district court shall consider, among other things, "the history and characteristics of the defendant" and the need for the sentence to "promote respect for the law"). Contrary to Patel's representations, there is no indication that the court "did not like" him and sentenced him inappropriately as a result.

In sum, we see no procedural error in Patel's sentencing.

## B.  Substantive Reasonableness

Patel also challenges the substantive reasonableness of his sentence. A sentence is substantively reasonable "if the district court gives meaningful consideration to the factors enumerated in 18 U.S.C. § 3553(a), including the advisory Sentencing Guidelines, and arrives at a sentence that is objec-

tively reasonable in light of the statutory factors and the individual circumstances of the case." *United States v. Rosen*, 726 F.3d 1017, 1027 (7th Cir. 2013) (quoting *United States v. Shannon*, 518 F.3d 494, 496 (7th Cir. 2008)). On appeal, we presume that a within-Guidelines sentence is reasonable: "it follows that a sentence below the range also is presumptively not too high." *United States v. Curb*, 626 F.3d 921, 927 (7th Cir. 2010) (quoting *United States v. Anderson*, 580 F.3d 639, 651 (7th Cir. 2009)). A defendant can rebut this presumption "only by showing that the sentence does not comport with the factors outlined in 18 U.S.C. § 3553(a)." *United States v. Solomon*, 892 F.3d 273, 278 (7th Cir. 2018).

We presume that Patel's below-Guidelines sentence of 25 years' imprisonment is reasonable. Patel argues, however, that the disparity that this sentence created between himself and his coschemer Fisher was unwarranted. A district court has the discretion to consider the sentences of codefendants at sentencing. *Id.* That discretion extends to the situation we face here, where a codefendant or coschemer has not yet been sentenced but the district court is handling both cases and has enough information before it to compare respective culpabilities. *Id.* at 279. Patel stresses that he and Fisher participated in the fraud scheme as partners and had comparable levels of culpability, and therefore it was unreasonable for the court to impose a sentence on him that was 15 years longer than any Fisher could have received.

Patel initially contends the district court misunderstood his disparity argument when the court stated that it "smacks of … selective prosecution." According to Patel, "[t]he argument was not one of selective prosecution, but of unjustifiable

and unwarranted disparity in sentences between two defend-ants who were comparatively culpable in the exact same scheme, regardless of what the statutory maximum sentence was." However, in context, the court's reference was appro-priate. Although the government acknowledged that Patel and Fisher were both heavily involved in the First Farmers scheme, the government charged the two very differently. It charged Fisher with one count of money laundering, subject-ing him to a maximum punishment of 10 years' imprison-ment; it indicted Patel for five counts of wire fraud, subjecting him to a maximum punishment of 100 years. Patel blindly pleaded to his indictment; Fisher pleaded guilty pursuant to a plea agreement. Even though these two individuals were both involved in the same scheme, there was not, as the dis-trict court explained, any "basis for [the court] to review the discretion of the U.S. Attorney's Office in viewing the two de-fendants differently … based on their view of who is the prime mover in this very substantial fraud and who was a prime mover, but a little less prime." *Cf. United States v. Scott*, 631 F.3d 401, 406 (7th Cir. 2011) ("In order to ensure that pros-ecutorial discretion remains intact and firmly within the prov-ince of the Executive, judicial review over prosecutorial dis-cretion is limited."); *United States v. Duncan*, 479 F.3d 924, 928 (7th Cir. 2007) ("Absent a showing of invidious discrimina-tion, we shall not second guess a prosecutor's decision re-garding the charges it chooses to bring.").

Turning to the merits of the challenge, there is certainly a stark disparity between the sentence of 25 years Patel received and the statutory maximum of 10 years that Fisher faced (a sentence he ultimately received). However, Fisher's much lower sentence "does not negate the reasonableness of the sentence the court imposed on [Patel]." *Gill*, 889 F.3d at 378

(quoting *United States v. Hill*, 683 F.3d 867, 871 (7th Cir. 2012));
*see also Duncan*, 479 F.3d at 929 ("18 U.S.C. § 3553(a)(6) does
not instruct district courts to avoid all differences in sentenc-
ing, only *unwarranted* disparities 'among defendants with
similar records who have been found guilty of similar con-
duct.'" (quoting 18 U.S.C. § 3553(a)(6))). The record reveals
several major differences between Patel's and Fisher's con-
duct that warrants a disparity between their respective sen-
tences. Most notably, as far as the record reflects, Fisher did
not engage in an entirely new fraudulent scheme while on
bond, attempt to pass off the money received from that fraud
as legitimate recovery for Pennant victims, and try to flee the
country and seek asylum elsewhere. As Patel noted at sen-
tencing, this conduct is not necessarily a "blank check" to
ratchet up Patel's sentence, but it is certainly indicative of dif-
ferences between his and Fisher's conduct warranting differ-
ences in their sentences.[5]

Patel insists, though, that both he and Fisher had the same
culpability on the underlying fraud, making this 15-year dis-
parity inappropriate. But the court adequately explained why
despite some "relative parity" between Patel and Fisher, it
viewed Patel as more culpable. Pennant dealt almost exclu-
sively with Patel, who told people to "[j]ust deal with me."
Patel also completely controlled the bank account to which all
the money from Pennant was sent and, as he acknowledges,

---

[5] Patel also alludes to the fact that he has a stronger argument for mit-
igation of his sentence than Fisher based on his "extensive efforts to re-
coup funds to repay the victims of the scheme." Indeed, this is a difference
between Patel and Fisher. But, as Patel acknowledged, at least some of
these funds were the result of the new fraud Patel engaged in while on
bond and while he planned his flight to Ecuador.

received a larger share of the stolen funds. Patel alone created the fake USDA loan packages to send to Pennant and forged signatures of USDA employees on them. These differences in Patel's and Fisher's offense conduct, along with the vast difference between their post-offense behavior, warrants a disparity in their sentences. The district court did not err by taking such differences into account. *See Solomon*, 892 F.3d at 278.[6]

Thus, Patel's sentence was not substantively unreasonable due to the disparity between his and Fisher's sentences. Patel has identified no other reason to question the substantive reasonableness of his sentence. To the extent Patel bases his substantive challenge on the other procedural errors he raises—the unwarranted disparities with other fraudsters, the failure to mention all § 3553(a) factors, and the court's comments about his flight and psychological state—this challenge also fails. Just as these alleged errors did not render his sentencing proceeding unreasonable, they provide no basis for concluding the court sentenced Patel in an objectively unreasonable way. The court considered all of Patel's arguments and articulated a sentence based on appropriate factors. This was not an abuse of discretion. *See Pulley*, 601 F.3d at 668.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[6] And although the district court acknowledged on the record that it had not yet read Fisher's PSR, Patel acknowledged at the hearing that Fisher was in criminal history category I, while Patel was in category IV. This is "a distinction significant enough to warrant disparity." *Hill*, 683 F.3d at 871.